IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| **South Carolina State Conference and Georgetown County Branch of the National Association for the Advancement of Colored People, FourSix Development, LLC,** and **We Do Good Work, LLC**<br><br>                              Plaintiffs,<br><br>           vs.<br><br>**Georgetown County**, a political subdivision of the State of South Carolina, and the members of the **Georgetown County Council** in their official capacities,<br><br>                              Defendants. | Civil Action No. 2:22-cv-04077-BHH<br><br><br><br>**COMPLAINT** |

## INTRODUCTION

1.      This case concerns Plaintiffs' effort to develop badly needed affordable housing in Georgetown County and Defendants' actions which ultimately derailed it. This affordable housing development was to be known as Porter's Landing. Defendants' decision to oppose Porter's Landing was not based on the County's housing needs or sound land use planning. In fact, Defendants' opposition was contrary to those considerations. Instead, Defendants were motivated by racism and classism. Their decision will result in substantial and disproportionate harm to Black[1] households, and it will perpetuate existing and longstanding patterns of segregation and racial injustice in Georgetown County. These actions constitute unlawful

---

[1] Unless otherwise indicated, references to White population reflect the population that is "White Alone, Not Hispanic or Latino," and references to Black population reflect the population that is "Black or African American Alone, Not Hispanic or Latino."

discrimination in violation of the Fair Housing Act and the Equal Protection Clause of the United States Constitution.

2.      Dating back to the eighteenth century, Georgetown County was the site of large-scale plantation-based agriculture with rice and indigo as the primary crops. As of the first U.S. Census in 1790, 59.4% of residents of what was then called the Georgetown District were enslaved. By 1840, the County produced nearly half of the total rice crop of the United States, and the city of Georgetown was the largest rice-exporting port in the world. By 1860, 85.7% of the population of Georgetown County was enslaved. The enslaved Black majority labored on those plantations under brutal conditions, building the wealth of White landowners.

3.      Wedgefield Plantation, which sits on the banks of the Black River just north of the city of Georgetown, embodies this history. In 1790, Joseph Wragg, then owner of Wedgefield Plantation, owned 119 human beings as slaves. By 1850, Rev. Maurice Lance, the owner of Wedgefield and nearby Mauricena plantations, would produce 660,000 pounds of rice with the labor of 262 human beings he owned as slaves. The modern-day property owners of Wedgefield Plantation would play a prominent role in the effort that ultimately derailed Porter's Landing.

4.      Following emancipation and until the onset of Georgetown County's rapid population growth in the 1970s, the area remained either majority-Black or nearly so. As of the 1970 Census, 48.4% of the population was Black. Around that time, however, Georgetown County began to experience development that shifted the area from a primarily agricultural one to one focused on tourism and catering to a population of retired, mostly White transplants from the northeast. Today, the County's population is only 30.9% Black. Just as Black residents

gained the power to have a say in county government for the first time since Reconstruction due to the passage of the Voting Rights Act of 1965, they began to be priced out of their community.

5.     Today, Black households in Georgetown County are much more likely to be renter households and have a greater need for affordable rental housing relative to White households. While approximately 31% of the Georgetown County population is Black, more than 80% of affordable rental housing units in the County are occupied by Black households, and 94% of Housing Choice Vouchers are held by Black families.

6.     In its Comprehensive Plan, Georgetown County has for more than a decade recognized the need for more affordable housing in the County and the Comprehensive Plan specifically states that "race greatly impacts a person's housing options" within the County. For many years the County's land use goals have included developing "programs to maintain and expand affordable housing including . . . public/private partnerships to provide new affordable housing."

7.     Yet, despite recognizing the need for affordable housing, in particular for Black families, and despite the fact that the Georgetown County Council has planning and zoning authority over 97% of the land area within the County, the vast majority of affordable housing within the County has been planned, approved, and constructed within the municipal limits of the City of Georgetown and the Town of Andrews. In fact, only one affordable housing development exists in the unincorporated areas of the County, and it was constructed more than 30 years ago. The residents of this single complex, consisting of 47 units, are far less likely to be Black (28%) compared to residents of affordable housing within municipal limits (88%). Under Defendants' planning and zoning authority, affordable housing has seldom been built, and the little that exists disproportionately benefits White households.

COMPLAINT                                                                 Page **3** of **58**

8.      In an effort to help remedy the shortage of affordable housing in Georgetown County and to counteract the racial segregation that this shortage perpetuates, Plaintiffs FourSix Development and We Do Good Work sought to develop a 90-unit affordable housing complex in unincorporated Georgetown County approximately 1.6 miles southwest of Wedgefield Plantation. This development was to be known as Porter's Landing.

9.      Today, though it has transitioned from rice plantation to golf course community, Wedgefield Plantation retains its name. Early in their efforts to develop Porter's Landing, Plaintiffs sought to engage Wedgefield residents to explain the development and gather residents' feedback throughout the design and development process. Instead, Plaintiffs were met with threats and hostility. Wedgefield residents organized a campaign against Porter's Landing grounded in misinformation, stereotypes, racism, and classism.

10.     Defendants eventually joined this campaign. While key members of Defendant County Council initially expressed their support for Porter's Landing, they reversed course after opposition from Wedgefield Plantation surfaced. Instead of approving a zoning amendment that would have been entirely consistent with the County Comprehensive Plan, in line with the unanimous recommendation of the Georgetown County Planning Commission and would have remedied an existing zoning approval that was (and is) out of compliance with State law, Defendants rejected that amendment and, in doing so, scuttled the project. Without this zoning amendment, Porter's Landing cannot be built.

11.     This denial of safe, decent affordable housing will increase housing insecurity among Black residents and contribute to a litany of harms including increased housing cost burden, continued exposure to unsafe housing conditions in dilapidated structures, and reduced access to the jobs and community amenities near the proposed location of Porter's Landing.

12.     Plaintiffs bring this action seeking declaratory and injunctive relief to reverse the harms caused by Defendants' actions, as well as damages that would fully compensate Plaintiffs for the loss that Defendants' conduct has caused.

## PARTIES

13.     Plaintiff South Carolina State Conference of the NAACP ("SC NAACP") is a nonprofit, nonpartisan membership organization in South Carolina. The SC NAACP is a state conference of branches of the National Association for the Advancement of Colored People ("NAACP"), a national civil rights organization. It was chartered in 1939 and is the oldest civil rights group in South Carolina with approximately 11,000 members throughout the State. The NAACP is a non-profit, non-partisan corporation with over 300,000 members. The NAACP is the nation's largest and oldest grassroots-based civil rights organization. Its mission is to achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color. Throughout its history, the NAACP has advocated for equal access to safe, quality, affordable housing.

14.     Plaintiff Georgetown County Branch of the NAACP ("Georgetown NAACP") is the local branch of the SC NAACP in Georgetown County. It brings this action on behalf of its over 140 members. Marvin Neal is the current President of the Georgetown NAACP.

15.     Plaintiff FourSix Development, LLC ("FourSix") is a private limited liability company registered to do business in the state of South Carolina. FourSix's mission is to embolden the underserved to live a healthy, modern lifestyle and to gain an increased opportunity to excel within a community. FourSix has extensive experience with the design, approval, construction, and management of affordable residential housing developments.

16.     Plaintiff We Do Good Work LLC ("WDGW") is a private limited liability company registered to do business in the state of South Carolina. Plaintiff FourSix established Plaintiff WDGW for the purpose of acquiring, developing, and holding title to the Porter's Landing site.

17.     Defendant Georgetown County (the "County") is a political and geographical subdivision of the State of South Carolina created for the purpose of the provision of government services and operating under South Carolina law.

18.     Defendant Georgetown County Council (the "Council") is the County's legislative body and the entity responsible for establishing County policies. The Council has legislative authority to approve, deny, or defer applications for certain zoning entitlements and development approvals, including planned development districts. Each Council Member is sued in their official capacity only.

## JURISDICTION AND VENUE

19.     Subject matter jurisdiction is conferred on this court pursuant to 42 U.S.C. § 3613 in that this is an action arising under the Fair Housing Act, Title VIII of the Civil Rights Act of 1968 (as amended by the Fair Housing Amendments Act of 1988), 42 U.S.C. § 3601 *et seq*.

20.     Subject matter jurisdiction is also conferred on this court pursuant to 28 U.S.C. § 1331 in that this is a civil action arising under the laws of the United States.

21.     The court has the authority to grant the relief requested pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and 42 U.S.C. § 1988.

22.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions alleged herein occurred in this district.

23.     The case is properly filed in the Charleston Division pursuant to Local Civ. Rule 3.01 (D.S.C.) because a substantial part of the events or omissions alleged herein occurred in Charleston Division counties.

## STATUTORY AND REGULATORY BACKGROUND

24.     Established by the Tax Reform Act of 1986, the Low-Income Housing Tax Credit ("LIHTC") program is currently the primary mechanism funding the construction and rehabilitation of affordable rental housing units in the United States.

25.     Rents for LIHTC-funded housing units are typically set so that they are affordable to a household making no more than 60% of the Area Median Income ("AMI") as determined by the U.S. Department of Housing and Urban Development ("HUD").

26.     Rather than pay a direct subsidy to owners or developers, the LIHTC program uses tax credits to incentivize private investment in affordable housing developments. When developers are awarded tax credits, they sell those tax credits to investors in exchange for equity. The investors, in turn, use the tax credits to offset their income tax liability. Two types of tax credits are available: one at 9% of qualified basis and one at 4% of qualified basis. The 9% credits can support approximately 70% of the cost of the low-income units in a development; the 4% credits support approximately 30% of that cost.

27.     The 9% credits are allocated through a competitive application process. The 4% credits are generally allocated on a non-competitive basis.

28.     LIHTC programs are typically administered at the state level by housing finance agencies. In South Carolina, the housing finance agency is the South Carolina Housing Finance and Development Authority ("SC Housing").

29.     Like other state housing finance agencies, SC Housing administers the LIHTC program pursuant to a Qualified Allocation Plan ("QAP"). SC Housing's QAP establishes a scoring system for proposed developments to determine whether they qualify for tax credits and whether they will receive an allocation of the highly competitive 9% tax credits. S.C. Housing's QAP is subject to periodic amendment.

30.     Under the SC Housing QAP in place at the time of the events alleged herein, applications for 9% credits were evaluated on 15 different criteria. This evaluation took place in two phases with a maximum score of 135 points. Up to 80 points are awarded during the first phase based on characteristics of the proposed development site, whether the development site is owned by a local government, and the county in which the development site is located.

31.     A significant portion (up to 40 points) of a proposed development's score during phase one is based on the Palmetto Opportunity Index ("POI") rating of the census tract where the proposed development site is located. The POI rating of a census tract is based on a number of factors including affordable housing supply, poverty rate, commute time, and life expectancy and ranges between "very high" and "very low."

32.     The QAP awards proposed developments the following points based on their POI rating:

- "Very High"   40 Points
- "High"         30 points
- "Moderate"     20 points

- ▪ "Low"          10 points
- ▪ "Very Low"   0 points

33.     Development sites in census tracts that rate below "very high" on the POI are very unlikely to be awarded competitive 9% LIHTC funding. During the 2021 LIHTC funding cycle, 17 out of 18 developments that were offered 9% tax credits were located in census tracts that rated "very high" on the POI. The remaining development was in a census tract that rated "high."

34.     Proposed development sites are also scored on the following site characteristics during phase one:

- ▪ Proximity to jobs paying wages in a specified range – up to 10 points
- ▪ Located entirely within a Qualified Opportunity Zone – 5 points
- ▪ Not located in a Racially or Ethnically Concentrated Area of Poverty – 5 points

35.     In addition to site characteristics, proposed developments are also scored based on the following criteria during phase one:

- ▪ Located on land owned and donated by a local government – 5 points
- ▪ Located in a County with a significant affordable housing shortage – up to 10 points
- ▪ Located in a County that did not receive a 9% LIHTC award in the last 5 years – 5 points

36.     During phase two of the application process for 9% credits, the QAP awards a maximum of 55 additional points. Of those, 35 points are based criteria which the developer alone can elect to comply with or which are based on the developer's history with the LIHTC program. The remaining 20 points depend on the availability of alternate funding sources or commitments by third parties.

## FACTUAL ALLEGATIONS

37.     This action concerns Plaintiff FourSix's attempts to develop 90 units of badly-needed affordable housing in Georgetown County and Defendants' actions which have, to date, prevented that development, which was to be known as Porter's Landing.

### A. Georgetown County Geography

38.     Georgetown County consists of 521,952 acres with its eastern portion bisected by the Waccamaw River as it joins the Great Pee Dee River in Winyah Bay. The Waccamaw River divides the western portion of Georgetown County from the peninsula known as the Waccamaw Neck which is bounded by the Atlantic Ocean on its east.

39.     There are three incorporated areas in Georgetown County. Two, the City of Georgetown and the Town of Andrews, are in the portion of the County west of the Waccamaw Neck. The third, Pawleys Island, is located on the Neck. These three areas occupy a total of 15,167 acres, just under 3% of the total acreage in Georgetown County. The remaining 97% of the County is unincorporated and subject to the planning and zoning authority of the Georgetown County Council.

40.     Approximately 85% of the land in unincorporated Georgetown County is vacant and undeveloped with the majority of that land being used for agricultural or forestry purposes.

41.     Development in Georgetown County is predominantly rural in nature. High density and multi-family developments in the County are located primarily in the incorporated areas and on the Waccamaw Neck.

42.     Low density and mobile home residential developments are the dominant form of development in the unincorporated areas of the County outside the Waccamaw Neck. They

comprise approximately 90% of the developed land in those areas. These tend to be small, isolated residential areas separated by large tracts of undeveloped land.

43.    Multi-family residential development comprises only 0.11% of the developed portion of unincorporated Georgetown County.

### B.  Patterns of Segregation in Georgetown County

44.    There are significant patterns of residential racial segregation within Georgetown County. Specifically, the White population of Georgetown County is concentrated in coastal beach communities in the northeastern portion of the county and in newer subdivisions in unincorporated areas surrounding the two main urbanized communities of Georgetown and Andrews. The Black population is concentrated in the incorporated portions of those two communities and in rural, primarily agricultural, parts of the county.

45.    Georgetown County comprises a regional housing market for its residents, with residents frequently moving between and among the county's incorporated and unincorporated communities. Barriers to housing in unincorporated Georgetown County affect residents of the city of Georgetown and the town of Andrews, and barriers to housing in those municipalities affect residents of unincorporated Georgetown County, as well.

46.    Georgetown County's Black population has been in decline for decades. In 1990, Black residents made up 43% of Georgetown County's population. By 2019, that number had fallen to 30%.

47.    Currently, a majority of the population of Georgetown County is White. According to the 2020 Census, Georgetown County is 64.5% White and 28.5% Black, the city of Georgetown is 40.3% White and 51.7% Black, and the town of Andrews is 31.5% White and

62.5% Black. Further, the unincorporated areas that surround Georgetown and Andrews are disproportionately White. According to the American Community Survey (an annual survey published by the Census Bureau), as of 2015-2019, Block Group 2 of Census Tract 9203.02, which includes the vicinity of Wedgefield Plantation and the planned location of Porter's Landing, is 72.5% White and 18.9% Black.

48.     While there are concentrations of Black residents in Georgetown and Andrews, the surrounding areas – including Wedgefield Plantation and the planned location of Porter's Landing – are overwhelmingly White. Each red dot on the map below represents ten Black residents, and each yellow dot represents ten White residents.

**Map of Racial Demographics in Georgetown County**



49.     The Dissimilarity Index is the most widely used measure of racial residential segregation. The Dissimilarity Index is calculated as the percentage of a minority group (in this case, Black residents) that would have to move to achieve an "even" racial/ethnic distribution in relation to another group (for example, Whites), where every Census block would have the same racial distribution as the entire county. Using 2020 Census data, the Dissimilarity Index value between White and Black populations for Georgetown County at the block-level is 0.5941. In other words, 59% of the Black population would have to move to achieve a balanced distribution between White and Black residents in Georgetown. Georgetown's Dissimilarity Index value is higher than the neighboring metropolitan statistical areas of Charleston (49%) and Myrtle Beach (36.6%).

50.     There is also a strong correlation between race and socioeconomic status in the area. According to the 2015-19 American Community Survey, the median income for Black households in Georgetown County is just $28,233 as opposed to a median income of $62,805 for White households. Three times as many Black Georgetown County residents have incomes below the federal poverty line (31.6%) as compared to White residents (10.5%). Moreover, data from the HUD's Comprehensive Housing Affordability Study (CHAS), which is derived from the 2013-2017 American Community Survey 5-Year Estimates, confirms that the population of Georgetown County renters that would be income-eligible for LIHTC housing is disproportionately Black, as well. More than half of renter households in the county with incomes below 50% of the Area Median Income (AMI) are Black. Additionally, according to 2020 data from HUD's Picture of Subsidized Households dataset, 96% of Housing Choice Voucher holders in Georgetown are Black.

**C. Background of Porter's Landing**

    i.    <u>The Porter's Landing Site</u>

51.    Porter's Landing was to be constructed on 16 acres of undeveloped land in unincorporated Georgetown County. The Porter's Landing site is part of a larger undeveloped 65-acre tract, TMS No. 02-1009-02-00, (the "Property") located approximately 1.5 miles north of the Georgetown city limits at the intersection of U.S. Highway 701 and Wedgefield Road.

52.    Georgetown Hospital System purchased the Property in December of 2008 and transferred it to its current owner, Georgetown Memorial Hospital, in August of 2009.

53.    In November 2008, the Georgetown County Council approved a rezoning of the Property to the Planned Development District (PDD). According to the Georgetown County Zoning Ordinance, the purpose of a PDD is to

> [P]rovide opportunities to create more desirable environments through the application of flexible and diversified land development standards under a comprehensive plan and program that is professionally prepared. The Planned Development District is intended to be used to encourage the application of new techniques and technology to community development which will result in superior living or development arrangements with lasting values. It is further intended to achieve economics in land development, maintenance of street systems and utility networks while providing building groupings for privacy, usable attractive open space, buffer zones, safe circulation and the general well-being of the inhabitants.

54.    The approved rezoning allows development of the Property with a single-use PDD consisting of a single four-story hospital building (275,000 sf); three two-story accessory use buildings (with an aggregate density of 115,000 sf); three three-story medical office buildings (with an aggregate density of 210,000 sf); and three "optional" pad sites to facilitate future infill development.

55.     The Property is bordered by a mixture of zoning districts and uses. Specifically, the Property is bordered by the Planned Development District to the west (a/k/a the "Crown Pointe Planned Development"), various residential zoning districts to the south and southwest, Forest Agriculture zoning district to the east, and a mixture of General Commercial, Forest Agriculture, and Residential Half Acre zoning districts to the north.

56.     Georgetown Memorial Hospital does not intend to implement the Planned Development District for the Property as it is currently approved. Instead, in January 2021, the Hospital entered into an agreement to sell the Porter's Landing site to Plaintiff We Do Good Work, LLC.

57.     The Porter's Landing site comprises the northeastern portion of the Property, and it includes the planned locations for two of the three approved medical office buildings and all three of the "optional" pad sites.

58.     In lieu of the approved medical office buildings, Porter's Landing was to consist of 90 units of affordable housing featuring a mixture of one-, two-, and three-bedroom duplexes, triplexes, and fourplexes. The development proposal also contemplates a clubhouse and playground for the private use of the residents.

59.     Plaintiff FourSix intended to develop Porter's Landing using LIHTC financing with the objective of serving households making 40% to 50% of AMI. For a four-person household in Georgetown County, this equates to an annual income of between $25,800 and $32,250 using HUD's 2021 income limits.

60.     Homes within Porter's Landing were to be arranged in such a way as to leave substantial pockets of green space. In addition, if developed, Porter's Landing would produce

significantly less traffic than the currently approved medical office building use would (a net reduction of 4,220 vehicle trips per day based on trip generation data from the traffic study submitted in connection with the current PDD approval).

61.     The Porter's Landing site had a number of features which made it attractive for the development of affordable housing using LIHTC financing.

62.     First, the Porter's Landing site is located in a census tract that is rated "very high" on the POI. Of the 60 points available during the preliminary LIHTC application phase, 40 are awarded based solely on the POI rating of the census tract in which the development is proposed to be built. Only three other census tracts in Georgetown County received the same rating and each of these is on the Waccamaw Neck where additional barriers to the development of affordable multifamily housing exist. The County's stated land use goal for the Waccamaw Neck is "to limit the number of new residential units that are added, so that the impacts of additional development (i.e. increased traffic congestion, increased storm water runoff, greater pressures on our overall infrastructure) are minimized as much as possible." In addition, land tends to be more expensive on the Neck, often prohibitively so, and there are few parcels available of sufficient size to construct an economically viable LIHTC development.

63.     Second, the Porter's Landing site is located in a State-designated Qualified Opportunity Zone and is not located in a Racially or Ethnically Concentrated Area of Poverty (R/ECAP) as defined by HUD. These factors garnered the Porter's Landing site an additional 10 points during the preliminary LIHTC application phase.

64.     Third, because of the severe affordable housing shortage in Georgetown County, SC Housing allocates an additional eight points to proposed LIHTC developments within the

County. Only one county in South Carolina, Beaufort, was allocated more points for its affordable housing shortage.

65.     Finally, the Porter's Landing site was the only parcel of land that Plaintiff FourSix was able to locate at the time which was available for purchase, had the above features, and was large enough to feasibly build a LIHTC development. SC Housing's QAP provides that no LIHTC new construction development may consist of fewer than 40 units and, in Georgetown and other "Group A" counties, may consist of up to 90 units. In addition, many of the other potential sites that were available, in addition to being smaller and less economically feasible, were in close proximity to the downtown area of the City of Georgetown and near industrial sites where contamination was a concern.

    ii.    <u>The LIHTC Application and Re-zoning Proposal</u>

66.     On February 19, 2021, Plaintiff FourSix submitted a preliminary 9% LIHTC application to SC Housing for the proposed Porter's Landing development. This application was submitted on behalf of Plaintiff FourSix and its partner on the Porter's Landing project, BlueLine Development, Inc.

67.     Under the Porter's Landing site's current zoning, despite the fact that more intensive hospital use is allowed, multifamily housing is not a permitted use.

68.     The Georgetown County Zoning Ordinance permits multifamily residential dwellings by right in only one zoning district, the General Residential District. The Zoning Ordinance permits multifamily residential dwellings as a conditional use, subject to approval by the Council, in two zoning districts, the Planned Development District and the Flexible Design District. In general, the properties zoned to the General Residential District, Planned

Development District, or Flexible Design District are concentrated within the eastern area of the County, particularly on Waccamaw Neck and areas near the outskirts of the City of Georgetown.

69.     In order to facilitate Plaintiff FourSix's development program, on February 19, 2021, Georgetown Memorial Hospital (in its capacity as the owner of the Porter's Landing site) filed an application to amend the approved Planned Development District for the Property to include multifamily housing uses among the list of permitted uses for the Porter's Landing site (the "Zoning Application").

    iii.     <u>How the rezoning proposal and planned Porter's Landing development would have fit with Georgetown County's existing land use plans, housing needs, and South Carolina law</u>

70.     Approving the Zoning Application would have been consistent with the Georgetown County Comprehensive Plan, in alignment with Georgetown County's housing needs, and would have brought the Planned Development District into compliance with South Carolina law.

*a.     The Georgetown County Comprehensive Plan*

71.     The Georgetown County Comprehensive Plan is developed pursuant to the South Carolina Local Government Comprehensive Planning Enabling Act of 1994, S.C. Code Ann. § 6-29-310 *et seq.* (the "Planning Act") and serves as a guide for the County's future development. The Planning Act requires that a Comprehensive Plan be adopted by the County governing body after a public hearing. The purpose of a zoning ordinance is to "help implement the Comprehensive Plan" and zoning regulations "must be made in accordance with the comprehensive plan for the jurisdiction."

72. The Georgetown County Comprehensive Plan includes two elements which offer guidance relevant to the Zoning Application: the Land Use Element and the Housing Element.

73. The Land Use Element is a "guide [to] future development and redevelopment within the County," and it is "intended to assist the County when determining the proper use of land and . . . serve as a basis for zoning map amendments, zoning code revisions, establishment of new zoning districts, development standards, and other land use implementation tools."

74. The Land Use Element establishes land use goals for the County including, in relevant part, to "[d]evelop programs to maintain and expand affordable housing including . . . public/private partnerships to provide new affordable housing."

75. The Land Use Element designates the Porter's Landing site as a "Transitional" use area, which confers a recommendation for "[t]he development of a tract of land, building, or structure with a variety of complementary and integrated uses, such as, but not limited to, residential, office, medical office, limited retail, public, or entertainment, in a compact urban form."

76. The Porter's Landing site is bordered by sites with a variety of recommended uses in the Land Use Element Map. Specifically, the Porter's Landing site abuts a "Transitional" use area to the east, a "Low Density Residential" area to the north, a "Medium Density Residential" use area to the west, and a mixture of "Commercial" and "Low Density Residential" use area to the south.

77. The Housing Element of the Georgetown County Comprehensive Plan is the County's primary planning guidance for housing development within the County. The Housing

Element sets forth a detailed analysis of the County's existing housing stock and identifies local barriers to housing access as well as the production of new housing.

78.     The Housing Element states that "[l]ocal agencies and organizations report a constant demand for affordable housing units in the county" and that "[t]he new housing units being constructed in the County are not likely to be in the lower income affordability range. As the older lower cost housing units are phased out or become unusable, the need for affordable housing units for the many residents with lower incomes will become more crucial." The Housing Element also describes rising land costs and regulatory hurdles as posing challenges for the implementation of new affordable housing. The Housing Element identifies the flexibility provided by the Planned Development District as a tool that can help offset the challenges associated with creation of new affordable housing.

79.     The Housing Element also acknowledges the connection between socioeconomic status, race, and housing affordability in the County. Noting that the percentage of Black Georgetown County residents living below the poverty level significantly exceeds the percentage of White and other County residents living below the poverty level, the Housing Plan states that "race greatly impacts a person's housing options" within the County.

80.     The Housing Element acknowledges that non-economic factors may also provide a barrier to accessing affordable housing. The Housing Element states: "Housing discrimination operates not only through efforts of exclusion based upon economic means, but may also be rooted in racial, nationality, gender, disability or marital status. . .. Housing discrimination and land use decisions that operate in a discriminatory fashion ensure that segments of the County's population will consistently have fewer housing options. The overall general welfare of all county residents is linked to the wellbeing of every component of the County's population.

Efforts to promote fair housing policies and practices in the County will be an overall benefit to improving conditions."

### b.     *The Georgetown County Housing Needs Assessment*

81.     In April 2021, Bowen National Research published the findings of a housing needs assessment ("Assessment") commissioned by the County. The Assessment concludes that Georgetown County is underserved by multiple housing typologies across varying levels of affordability, noting that "the needs of the [C]ounty are large and diverse enough to support new product in most areas of the [C]ounty." The Assessment also recommends that the County "[s]upport a broad base of housing development initiatives" and "[c]onsider initiatives that help offset the costs of residential development, particularly the development of affordable housing." The Assessment also identifies a linkage between housing and economic development, noting that "the lack of available and affordable housing appears to be limiting economic growth and hurting local employers."

82.     The Assessment also notes that most unit types have median rents above $1,050 and are not affordable to over two-thirds of renter households in the County. And it notes the strong demand for LIHTC rental units finding an overall Tax Credit occupancy rate 97.8%.[2]

### c.     *State Law Governing Planned Development Districts*

83.     Finally, approving the Zoning Application would have brought the Planned Development District (PDD), which included the Porter's Landing site, into compliance with State law.

---

[2] Occupancy data in that analysis excludes one development that was still in the initial lease-up process at the time of the Assessment (Villas at Winyah Bay).

84.     Under the South Carolina state law that creates PDDs, a development within a PDD must contain a mixture of land uses, such as but not limited to "housing of different types and densities and of compatible commercial uses, or shopping centers, office parks, and mixed-use developments." S.C. Code Ann. § 6-29-720(C)(4)*; see also Sinkler v. County of Charleston,* 387 S.C. 67, 690 S.E.2d 777 (2010) (holding that a PDD that did not contain housing and commercial use was impermissible under the statute).

85.     The County has approved the current PDD, which includes the Porter's Landing site, only for medical uses. The approved PDD does not permit "housing of different types and densities," as is required by applicable State law. Approval of the Zoning Application would have introduced residential uses to the PDD and thereby would have brought the PDD into compliance with State law requiring a mixture of land uses.

    iv.     <u>Plaintiff FourSix's Initial Meetings with Georgetown Officials and the Wedgefield Community</u>

86.     In late March 2021, a representative of BlueLine met with Council Member Bob Anderson, Council Chair Louis Morant, and Brian Tucker, then the County's director of economic development. At that time, all involved viewed the development favorably, and Council Member Anderson indicated that he would support any development outside of the Waccamaw Neck.

87.     On April 12, 2021, representatives of FourSix met with Planning Commission staff to discuss a community meeting scheduled for later that day at Wedgefield Plantation, a golf course community located approximately 1.6 miles northeast of the Porter's Landing site along Wedgefield Road. A member of staff planned to attend that meeting and warned FourSix of negative social media attention that the proposed development had already received.

88.     That afternoon, Plaintiff FourSix held a public meeting at the nearby Wedgefield Plantation neighborhood. Approximately 100 individuals attended. Representatives of FourSix and BlueLine described the need for affordable housing in Georgetown County and explained the reasons that the Porter's Landing site had been chosen. They explained that the Zoning Application was an early step in the development process and that a full design proposal would have to be prepared and approved in later stages. They promised to offer Wedgefield residents an opportunity to review and comment on the design proposal and assured them that a traffic study would be conducted to address concerns raised about increased traffic on Wedgefield Road.

89.     The gathered crowd expressed hostility toward both the developers' representatives and the idea that affordable housing could be built in the area. Attendees asked, "does that mean these people [those who would live at Porter's Landing] live on the streets now?" and demanded to know whether Porter's landing would be HUD-funded or "Section 8." They asked the developers' representatives whether they would live next to a project that they were currently developing. They complained of potential traffic problems even though they were assured that a traffic study would be conducted, and improvements made if needed. They expressed concern that Porter's Landing would be "out of character" and "not something that fits in at Wedgefield." They expressed concern that schools and grocery stores were not within walking distance from the Porter's Landing site, apparently assuming, despite previous concerns about traffic, that Porter's Landing residents would not have cars. They asked why the developers were not looking for properties on the south end of Georgetown or in the middle of Georgetown where affordable housing developments already existed.

90.     One Wedgefield resident summed up the "not in my backyard" sentiment expressed by numerous attendees as follows: "To have these low-income renters come in right

here, I know they need places to live and I want them to have a nice place to live, but I don't think right outside Wedgefield Plantation is the place it needs to go." This statement was met with applause from the audience.

91.    After the meeting, a representative of Plaintiff FourSix was approached by individuals who attended the meeting. Their commentary included threats – "[d]o you own a bullet proof vest? Because you may need one when you leave" – and references to the fact that Wedgefield Plantation previously housed slaves. This representative was told "[w]e don't want slaves living near us. Go build slave houses somewhere else."

92.    Wedgefield Plantation residents would later organize an extensive campaign in opposition to the Zoning Application. Emails to Council and the Planning Commission cite concerns relating to traffic, circulation, safety, property values, environmental concerns, and crime.

>    v.    Planning Commission Review of the Zoning Application

93.    In connection with its review of the Zoning Application, the Georgetown County Departments of Building, Planning, and Zoning prepared a written analysis of the Zoning Application. This analysis concluded, in pertinent part:

>    a.    The Zoning Application would be in conformance with the Land Use Element of the Comprehensive Plan;

>    b.    The Zoning Application would advance the County's policy objectives relating to affordable housing, as provided for in both the Housing and Land Use Elements of the Comprehensive Plan;

    c.  The Zoning Application would introduce new residential uses to the Planned Development District (PDD), thereby bringing the PDD into conformance with current State law; and

    d.  The Zoning Application would result in a significant net reduction of traffic as compared to the currently approved medical office building use (a net reduction of 4,220 vehicle trips per day, based on trip generation data from the traffic study submitted in connection with the current Planned Development District approval for the Property).

94.    On April 15, 2021, the Georgetown County Planning Commission held a public hearing on the Zoning Application.

95.    The Georgetown County Director of Building, Planning, and Zoning (Holly Richardson) testified at the Planning Commission hearing. Ms. Richardson's testimony reiterated many of the conclusions of the Departmental analysis of the Zoning Application.

96.    The Planning Commission voted unanimously (7-0) to recommend approval of the Zoning Application, subject to conditions which, *inter alia*, clarify the maximum recommended unit count for the Porter's Landing site, recommend that a "significant portion" of the units be committed as affordable, and recommend that the applicant submit certain post-approval conceptual development drawings to the County. Those conditions would not have adversely affected the viability of the proposed development.

97.    At the close of the Planning Commission meeting, the chair of the commission thanked attendees for their comments. In response, a member of the audience shouted "screw you" to which many members of the audience responded with laughter.

vi.    <u>Plaintiff FourSix's Meeting with Council Members Anderson and Newton After Opposition from Wedgefield Plantation Surfaced</u>

98.    On April 20, 2021, eight days after the public meeting at Wedgefield Plantation, a representative of Plaintiff FourSix met with Planning Commission staff and Council Members Bob Anderson and Raymond Newton. While Council Member Anderson had expressed his support for Porter's Landing during the prior meeting with FourSix, he now indicated his opposition to the development and stated that he did not want to be part of a "social experiment" for poor people. He also indicated that he wanted the County to fund its own affordable housing so they could choose where it was and who lived there. Council Member Newton raised concerns about different social and economic classes living near one another.

99.    Characterizing this effort to implement more affordable, equitable housing as a type of "social experiment" or "social engineering" that elected officials should not engage in reflects a long history of using these terms to hide opposition to racial integration. Opponents of racial equality and integration have frequently used coded language about general opposition to social experiments to challenge efforts to integrate communities through inclusionary zoning and affordable housing development in predominantly White areas. By invoking such language, Council Member Anderson and others rely upon language that is often used to paint attempts to remedy segregation as "unnatural or coerced."

100.    Neither Council Member Anderson nor Council Member Newton represented the district in which Porter's Landing was to be located.

vii.    First Reading Before Council

101.    On April 27, 2021, the Council held a public hearing for the First Reading of Ordinances for the Zoning Application (the "First Reading").

102.    Eleven speakers testified at the First Reading, including Marvin Neal, President of Plaintiff Georgetown NAACP, as well as various supporters and opponents of the Zoning Application.

103.    Council did not engage in any discussion of the Zoning Application or take any vote with respect to the Ordinance for the Zoning Application. Council read the Ordinance pertaining to the Zoning Application into the public record by title only.

viii.    Second Reading Before Council

104.    On May 11, 2021, the Council held a public hearing for the Second Reading of Ordinances for the Zoning Application (the "Second Reading").

105.    Twenty speakers testified at the Second Reading, including Marvin Neal, President of Plaintiff Georgetown NAACP, Tony Cates, Managing Partner of Plaintiff FourSix, and various supporters and opponents of the Zoning Application. Among other things, supporters cited the lack of affordable housing in Georgetown County and the economic development benefits more affordable housing would produce as demonstrated by the Bowen Study.

106.    Holly Richardson Director of the Georgetown County Department of Building, Planning, and Zoning testified at the Second Reading. Ms. Richardson's testimony reiterated many of the conclusions of the departmental analysis of the Zoning Application, particularly that the Zoning Application would be in conformance with applicable County comprehensive planning guidance for the Porter's Landing site and legal requirements for mixed-use planned

development districts. Ms. Richardson also reiterated the likely improvements in traffic conditions that would result from implementation of the Zoning Application in comparison to what the approved medical uses would generate.

107. After discussion, the Council voted 4-2-1 in favor of (i) amending the Ordinance for the Zoning Application to include the full text of the Ordinance and (ii) reading the Ordinance, as so amended, into the public record for a second time. Two Council Members (Bob Anderson and Raymond Newton) voted against the Zoning Application. Four voted in favor of the Zoning Application (Louis Morant, Lillie Johnson, Steve Goggans, and John Thomas). One Council Member (Everett Carolina) abstained from the vote.

ix.     Third Reading and Final Decision of Council

108. On May 25, 2021, the Council held a public hearing for the Third Reading of Ordinances for the Zoning Application (the "Third Reading").

109. After bringing the Zoning Application up on the Council agenda, Council Chair Louis Morant indicated that he had a potential conflict of interest and that he would be recusing himself from any discussion or vote on the Zoning Application to avoid any appearance of impropriety. Council Vice Chair Lillie Jean Johnson presided over discussion and the final vote on the Zoning Application.

110. Director Holly Richardson testified again at the Third Reading and summarized the Zoning Application.

111. Vice Chair Johnson then opened the floor for discussion among Council. Council Member Goggans spoke first in support of the Zoning Application and his comments indicated that the outcome of the vote was a forgone conclusion. He noted that it was rare in his experience

for Council to reject the unanimous recommendation of the Planning Commission and that "in order to grow this community, we need housing." He also noted that "we're sending a terrible message to the community, the housing community, the industrial community, the developer community, about what our intentions are and what our interests are in growing the economy."

112. Council Member Carolina then spoke in opposition to the Zoning Application. Apparently reading from prepared materials, Carolina argued that the County should be a partner in the creation of affordable housing and indicated his support for single-family home ownership. He indicated that the use of the Porter's Landing site could be revisited at a later time after "traffic issues, environmental issues, wetland issues, and conservation easement issues are clarified and addressed."

113. Council Member Anderson also spoke in opposition to the Zoning Application. He noted that he was pushing to develop the west side of the County when he ran for office, but that "as we turned back the layers of the issue it became obvious to me that it was a lot more complicated than that . . . [FourSix] wanted to put in a 90 unit complex that was gonna be for affordable, well I'm not even gonna say affordable housing, it's gonna be . . . occupied by people who can't afford to pay all of their rent. And that's not quite affordable housing. It's got another name." This statement implies a distinction between what is sometimes called "workforce" housing that is presumed to serve teachers, nurses, and first responders, on the one hand, and traditional public housing, which is presumed to serve extremely low-income households with limited earnings from wage employment, on the other. Due to the history of intentional racial discrimination in its development, administration, and maintenance, traditional public housing has long been stigmatized, both overtly and covertly, as housing that is "for" Black families. Council Member Anderson's statement was both reflective of and served to stoke race-based

opposition to Porter's Landing on the part of Wedgefield Plantation residents on the grounds that Black families would live there.

114.    Council Member Newton then spoke in opposition to the Zoning Application. He stated that it had been an honor to work for the past several weeks with Council Members Carolina and Anderson and that they looked forward to working with all council members and staff to address affordable housing and economic development "once we have this vote behind us."

115.    After discussion, the Council voted 3-3 on the Ordinance for the Zoning Application. Council Members Lillie Johnson, John Thomas, and Steve Goggans again voted in favor of the Ordinance for the Zoning Application. Council Members Bob Anderson and Raymond Newton voted against the Ordinance for the Zoning Application. Reversing his earlier abstention, Council Member Carolina joined Anderson and Newton in voting against the Ordinance. Council Chairman Louis Morant recused himself from the vote due to a conflict of interest.

116.    By virtue of the deadlocked vote, the Ordinance for the Zoning Application was denied.

x.    Public Opposition to the Zoning Application

117.    During the pendency of the Zoning Application, online discourse related to the Zoning Application was characterized by racist euphemisms and derogatory undertones. For example, online comments posted in the comment sections of Georgetown County Online (GAB News) articles included claims such as: "affordable housing would be great for Georgetown but

would it be used for the people in Georgetown or is [it] going to be used for the illegals[?]" and "affordable housing is another name for future ghetto . . . Breeding ground for crime."

118. Comments posted on social media contained similar vitriol including "[w]e do not want more projects in this town. It only breeds more lazy welfare lifers. We own a business by the projects and we see inbred, barely cognitive people wandering around all day begging."

119. Comments presented to the Planning Commission and Council included complaints about vague "cultural reasons" for opposing the Zoning Application, concerns purportedly relating to traffic and the potential for development of other low-income housing in the area. The opponents of the Zoning Application did not present any data or research to validate their claims about the alleged negative impacts of the Zoning Application. Rather, it appears that many of the objections to the Zoning Application were pretexts for opposition based on race.

120. The public record also contains copies of individual letters and emails sent to the County Council, several of which contain more disparaging and euphemistic comments about affordable housing, the LIHTC program, and the residents of such housing who, in Georgetown County, are disproportionately Black. These comments included:

    a. "I've been told this is not a Housing Choice Voucher, HCV program, (formally section 8), but I'm not convinced they're not the same."

    b. "Will building more subsidized housing increase the crime rate? Especially for Wedgefield Residents."

    c. "What are the crime stats for subsidized housing in Georgetown County?"

d. "We will be leaving Wedgefield [if the Zoning Application is approved] after putting hours of work and money into our home and forming lifetime friendships. Leaving is imperative to me because after working 30+ years in the social services field, the latter part of my career working long hours for the State of New York providing vocational services, I am tired and just want to retire peacefully. I have already seen, heard and absorb all the sadness that comes with working with diverse people in need."

e. A suggestion that re-evaluation of multi-family zoning in the County was needed because "[w]e may be forced to accept relocation of some of the millions of recent non-citizen border crossers"

121.    Many objectors suggested that affordable housing should be built on the west side of Georgetown where, as one objector stated, there were already "many dilapidated homes and vacant lots."

122.    Several objectors focused on one site in particular as a possible alternative to the Porter's Landing site. This site (the "Maryville site"), located on the southwest side of the City of Georgetown in the Maryville community, is significantly less advantageous than the Porter's Landing site for a number of reasons, including:

a. The Maryville site census tract was ranked "Very Low" in the Palmetto Opportunity Index, while the Porter's Landing site census tract was ranked "Very High." No proposed LIHTC development was funded in a census tract ranked "Very Low" during the 2021 cycle.

b. Nineteen percent of residents of the Maryville site census tract live below the poverty level while only 4.1% of residents of the Porter's Landing site census tract do.

c. The Maryville site census tract is 54.4% White and 34.5% Black, compared to the Porter's Landing site, which is in a census tract that is 73.4% White and 19.1% Black. Use of the Porter's Landing site for affordable housing would advance desegregation to a greater extent than the Maryville site.

d. The Maryville site is located directly across the road from an existing 114-unit public housing complex whose resident population is 90% Black.

e. Under applicable zoning and development regulations in the City of Georgetown, multifamily residential dwellings would not have been permitted by right at the Maryville site, and instead would have required (at minimum) receipt of a conditional approval by the City of Georgetown Council. In order to support comparable density to the Porter's Landing development, it may also have been necessary to obtain an amendment to the Maryville site's classification in the City's Comprehensive Plan.

123. The Maryville site was not a feasible alternative to the Porter's Landing site.

124. On May 24, 2021, the day before the Third Reading of the Zoning Ordinance and Council's ultimate rejection of the Zoning Application, a video was published on Brighteon.com,[3] under the title "Scandalous: The Making of a Georgetown Public Scandal." The

---

[3] This website presents itself as an outlet for videos that have been deleted from other sites like YouTube, Facebook, Google, Twitter, and Vimeo.

nearly nine-minute video insinuates that the Georgetown NAACP's support for the Porter's

Landing development was because of alleged connections between one of its board members, the

owner of the Porter's Landing site, and Council Chair Louis Morant. Further, this video

questioned whether the NAACP represented the interests of the Black community in Georgetown

County.

xi.    Evidence of pretextual motivations of Council "no" votes

125.    Council's rejection of the Zoning Application runs contrary to the County's stated

land use and housing policies, constitutes an abnormal repudiation of the Planning Commission,

is inconsistent with State law for multi-use planned development districts, and is inconsistent

with decisions not involving affordable multifamily housing.

126.    Under South Carolina law, legislative zoning decisions must be consistent with

the underlying comprehensive plan.

127.    During their deliberations at the Second and Third Readings of the Zoning

Ordinance, the Council Members who opposed the Zoning Application offered no justifications

having a basis in the guidance of the Land Use Element or Housing Element of the Georgetown

County Comprehensive Plan or other applicable County policy guidance. Instead, as noted

above, the County's rejection of the Zoning Application was contrary to the objectives stated in

the Comprehensive Plan.

128.    In addition, many of the public statements made by the Council Members

opposing the Zoning Application echoed the euphemistic and racially coded language used by

many of the public speakers. Council Member Anderson even went so far as to describe the

Zoning Application as an attempt at "social engineering," a racially motivated euphemism historically used by opponents of racial integration.

129.    Further, the County's rejection of the Zoning Application represents a repudiation of the Planning Commission which had unanimously recommended its approval. Such a repudiation is unusual to say the least. In fact, after a review of Georgetown County records covering January 1, 2019 through November 16, 2022 and involving 38 rezoning proposals, Plaintiffs were able to identify only one other instance in which Council rejected the Planning Commission's recommendation, even when that recommendation was made by a narrow margin.

130.    Finally, as discussed above, the County's rejection of the Zoning Application was inconsistent with needs identified in the Housing Needs Assessment and represents a refusal to bring the Planned Development District into compliance with State law.

xii.    Significant Successful Recent Re-zonings that Did Not Involve Affordable, Multifamily Housing

131.    Council's near-contemporaneous action on a zoning application submitted regarding another parcel (the "Goff Tract") demonstrates the degree to which its action on the Zoning Application for Porter's Landing was driven by opposition to affordable housing.

132.    On May 28, 2021, three days after Council rejected the Zoning Application for Porter's Landing, an application was filed with the Planning Commission seeking to re-zone the Goff Tract, a 14.77-acre tract located at 3138 Ocean Highway in unincorporated Georgetown County, to allow for increased development density. Existing zoning for the Goff Tract was One-Half Acre Residential (R ½), which allowed for single family residential dwellings on 20,000

square foot lots. The owners of the Goff Tract sought to rezone the property to 10,000 Square Feet Residential (R-10), which allows the same type of dwellings on 10,000 square foot lots.

133.    The rezoning proposal made no mention of affordable housing, and neither R ½ nor R-10 zoning allows multifamily dwellings.

134.    Public opposition to this rezoning application cited similar concerns to those raised in opposition to Porter's Landing: traffic, population density, and environmental impact, among others. Absent, however, were the racial undertones, references to cultural differences, and comments about social engineering that had plagued the Porter's Landing proposal.

135.    On July 15, 2021, a closely divided Planning Commission voted 3-2 to recommend that Council approve the Goff Tract rezoning application.

136.    On August 24, 2021, Council took its first vote on the proposal which was approved by a vote of four in favor (Carolina, Johnson, Goggans, and Newton), two opposed (Anderson and Thomas), and one recused (Morant).

137.    On October 26, 2021, Council took its second and final vote on the proposal which was approved by a vote of three in favor (Johnson, Goggans, and Newton), two opposed (Anderson and Thomas), one recused (Morant) and one abstaining (Carolina).

138.    The approval of the Goff Tract rezoning stands in sharp contrast to the rejection of the Porter's Landing rezoning for several reasons:

> a.    The Porter's Landing rezoning was consistent with the Comprehensive Plan and would have brought the Planned Development District into compliance with State law. In contrast, the Goff Tract rezoning was inconsistent with the Comprehensive Plan and required amendment of the Future Land Use Map in order

to be approved. In fact, the Land Use Element of the Comprehensive Plan states that "[t]he key now [for the Waccamaw Neck] is to limit the number of new residential units that are added, so that the impacts of additional development (i.e. increased traffic congestion, increased storm water runoff, greater pressures on our overall infrastructure) are minimized as much as possible."

b. The Planning Commission unanimously recommended approval of the Porter's Landing rezoning, while the Goff Tract rezoning received a bare majority recommendation of 3-2 in favor.

c. Public opposition to the Goff Tract rezoning was so strong that, after the rezoning was approved, a group of individuals and organizations filed suit against the County and others seeking a declaration that the ordinance approving the rezoning was procedurally improper and void. *See Middleton v. Georgetown County*, Georgetown County Court of Common Pleas, No. 2022-CP-22-00032, (filed Jan. 7, 2022).

139. The key difference between the Porter's Landing rezoning and the Goff Tract rezoning was that Porter's Landing was intended to be affordable, multifamily housing. Indeed, during second reading of the Goff Tract proposed rezoning on August 24, 2021, Council Member Anderson rebuffed one individual who had spoken in favor of the rezoning by arguing that the County needed more minority landowners and affordable housing. Anderson stated, "low-cost housing is not feasible on the Waccamaw Neck."

COMPLAINT                                                                    Page **37** of **58**

**D.  Recent History of Racial Discrimination in Georgetown County Government**

140.    Until 2008, Georgetown County maintained an at-large method of electing members to the County Board of Education. The result was that, while Black citizens comprised approximately 38% of the Georgetown County population at the time, the school board was all White and no Black candidates had won a school board seat in the three election cycles preceding March 2008. This system was abandoned only in the face of a suit by the Justice Department under Section 2 of the Voting Rights Act. *United States v. Georgetown County School District*, No. 2:08-cv-00889-DCN, filed March 14, 2008.

141.    Despite this recent history and the well-documented connection between at-large elections and disenfranchisement of Black voters, the idea still has powerful advocates in Georgetown County. In January of 2020, current Council Member Bob Anderson,[4] who voted against the Zoning Application, advocated eliminating the requirement that County Council members reside in the districts they represent. In response to Anderson's comments, then-Council Chairman John Thomas issued a statement expressing his opposition to Anderson's proposal and characterizing it as a reversion to at-large elections "which would never get U.S. Dept. of Justice approval."

142.    Anderson advocated for this change after the Georgetown NAACP raised questions about the residency of Council Member Austin Beard. Beard later resigned after the County Board of Elections found he had been deceitful when he declared his residency and that

---

[4] Anderson was not a member of Council at the time he made these comments, though he had previously served on Council representing District 6. He would be re-elected to represent District 2 in 2020.

he in fact lived well outside the district he had been elected to represent. In an offensive and ahistorical comparison, Anderson referred to NAACP's efforts to remove Beard as a "lynching."

143. Not long thereafter, and despite his initial support for the development, Anderson would become a powerful opponent of Porter's Landing and generally of housing programs "designed to move small pockets of low-income housing into larger areas of middle- and high-income properties." At the Second Reading before the County Council, Anderson called such programs "social engineering" and complained of "problems with intermingling the low-income folks with medium and high-income folks."

144. Anderson represents District 2, the voting age population of which is more than 90% White.

### E. Existing Affordable Housing in Georgetown County

145. There are approximately 990 publicly supported affordable housing units in Georgetown County including both HUD-subsidized units and LIHTC units. In addition, there are approximately 164 Housing Choice Vouchers authorized for use in Georgetown County.

146. However, demand for affordable housing in the County remains very high. According to HUD, approximately 95% of HUD-subsidized units in Georgetown County were occupied in 2021. And, according to the Georgetown Housing Authority, 148 households were on the waiting list for Housing Choice Vouchers as of January 2022. As previously noted, the Georgetown County Housing Needs assessment found an overall occupancy rate 97.8% for LIHTC properties.

**Map of Subsidized Properties in Georgetown County**



147.    Affordable housing units in Georgetown County are concentrated almost exclusively in incorporated areas outside of County Council's jurisdiction. In fact, but for a single complex (47 units), there are no HUD-subsidized or LIHTC units in the unincorporated areas of Georgetown County.

148.    Black families in Georgetown County disproportionately rely on existing affordable housing units. The following is a list of existing HUD-subsidized affordable housing developments in Georgetown County followed by the percentage of households residing in them who are Black:

| Development Name | Number of Units | Percent Black |
|---|---|---|
| Westside Apartments | 179 | 91% Black |
| Maryville South Apartments | 114 | 90% Black |
| Arbor Place | 48 | 95% Black |
| Millner Elderly Housing | 47 | 55% Black |
| Bethel Apartments | 30 | 100% Black |
| St. Elizabeth Place | 47 | 28% Black |

149.    St. Elizabeth Place, with by far the lowest percentage of Black tenants, also happens to be the only HUD-subsidized affordable housing complex in the unincorporated areas of the County. The development is also age-restricted to heads of households that are at least 62 years of age. The elderly low-income population tends to be more heavily White and less heavily Black than the population of younger low-income households.

150.    As with HUD-subsidized housing, Black families also disproportionately rely on LIHTC housing. While demographic data for LIHTC units is not available by apartment complex, statewide data show that 71.4% of LIHTC tenants are Black.

151.    The same is true of HCVs with 94% of vouchers in Georgetown County being issued to Black households.

152.    It is common for HCV recipients to have difficulty locating housing at which they can use their voucher. There is no general federal, state, or local requirement that landlords in South Carolina accept Housing Choice Vouchers. However, one beneficial feature of the LIHTC program for Voucher holders is that, under federal law the owner of a LIHTC development,

unlike most landlords, cannot reject an applicant simply because they are a voucher holder. Thus, LIHTC developments substantially benefit voucher-holders who, in Georgetown County as in many other areas, are disproportionately Black.

**F. Effect of Council Denial on Housing Patterns**

    i.    <u>Council's denial of the Zoning Application will have a disparate impact on Georgetown's Black community.</u>

153.    Council's decision denying the Zoning Application will have a disparate impact on Black residents in Georgetown County because the Porter's Landing development would have provided much needed affordable housing for the Black residents of Georgetown County who would have resided in that housing at rates far exceeding their proportion of the population of the county as a whole.

154.    This denial of safe, decent affordable housing will increase housing insecurity among Black residents thus contributing to a litany of harms including increased housing cost burden (paying an unsustainable portion of one's income on rent), exposure to unsafe housing conditions in dilapidated structures, and reduced access to the jobs and community amenities near the proposed location of Porter's Landing.

155.    Black households are much more likely to be renter households and have a greater need for affordable rental housing relative to White households. The decision to deny the Zoning Application disproportionately and significantly impacts Black households relative to White households. Five hundred seventy households in Georgetown County live in subsidized housing according to 2019 HUD data. Of these households, 85% are Black and 14% are White. The overall percentage of Black households living subsidized housing is 22.7%, while the overall

percentage of White households is 2.9%. In light of these percentages, Black renter households are nearly eight times as likely as White renter households to receive subsidized housing support in Georgetown County.

156.    There are also large income disparities between Black and White residents in Georgetown. In Georgetown, the median household income for White households is $62,805, while the median income Black households is just $28,233. White median incomes are 222% of Black median incomes.

157.    Public Use Microdata (PUMS) are datasets gathered by the American Community Survey containing records for a sample of housing units, with information on each housing unit and the people within it. PUMS data samples contain individual records and allow for more nuanced evaluations. These data samples are released for geographies known as the Public Use Microdata Area (PUMA). Georgetown County is not large enough to make up a PUMA of its own. Therefore, Georgetown is in PUMA 1000 along with neighboring Marion and Dillon counties. Georgetown County accounts for approximately 50% of the households in PUMA 1000. The data samples for PUMA 1000 estimate that 61% of Black renter households and 39% of White renter households have incomes below 40% of the Area Median Income (AMI), meaning that Black renter households are 1.56 times more likely than White households to have family incomes below 40% of AMI. When adjusted to 50% of the AMI, the percentage of Black renter households increases to 69% and the percentage of White households increases to 45%, meaning that that Black renter households are 1.53 times more likely than White households to have family incomes below 50% of AMI. In Georgetown, Black households are much more likely to have family incomes below 50% of AMI.

158.    If constructed, Porter's Landing would have provided an affordable housing option for the Black residents. Seventeen percent of the units were set to have income limits at 40% of AMI. Eighty-three percent of the units were set to have income limits at 50% of AMI.

159.    The occupants of Porter's Landing would have likely been disproportionately Black. If Porter's Landing was built and occupied according to the current composition of renters receiving subsidized housing in Georgetown County, 86% of the development would be occupied by Black households. If instead, Porter's Landing were occupied according to the racial composition of the income eligible population, which is less than 40% and 50% of AMI after adjusting for family size, 67% of the development would be occupied by Black households at either AMI. Finally, if Porter's Landing were occupied according to income-eligibility *by family size*, Black households would range from 64% of income-eligible 1- and 2-person families to 75% of 3- and 4-person families at less than 40% AMI.

160.    No matter what data point is deemed to have predictive value for who would live in Porter's Landing, if constructed, a much higher share of residents would be Black than in the countywide population. Black households in Georgetown County are more likely to be renters, more likely to be income-eligible for units made available at 40% and 50% of the AMI, more likely to use Housing Choice Vouchers (which must be accepted in LIHTC developments like Porter's Landing), and more likely to live in other affordable housing developments than are White residents. Thus, the denial of the Zoning Application will disproportionately and significantly impact Black households relative to White households.

ii.     Council's denial of the Zoning Application will perpetuate racial segregation in Georgetown County.

161.     Council's denial of the Zoning Application will perpetuate segregation in Georgetown County by failing to allow for the racial integration that Porter's Landing would have provided.

162.     There is a deep history of racial segregation in Georgetown County.

163.     As discussed earlier, the Black and White populations of Georgetown County are segregated from each other. Based on the 2020 Census, Dissimilarity Index value for Georgetown County is 0.5941. Further, the census tract and block group where Porter's Landing was to be located has a higher concentration of White residents—72.5% and 74.4%, respectively—than Georgetown County, which is just 65.0% White.

164.     Given that the area where Porter's Landing would have been built is disproportionately White relative to the County and the occupants of the housing would have been disproportionately Black, building the Porter's Landing development would have had an impact on the racial composition of the area. Porter's Landing would have increased the Black population of the block group where Porter's Landing is located so that it would be more similar to the racial composition of Georgetown County overall. To the extent that residents would have moved from predominantly Black block groups within Georgetown County, as is likely, the demographics of those block groups would also come to more closely resemble those of the County as a whole, as well.

165.    The Council's denial of the Zoning Application would perpetuate racial segregation because their decision denies the much-needed racial integration that the affordable rental units at Porter's Landing would have provided.

**G. Harm to Plaintiffs**

i.    <u>Plaintiffs South Carolina and Georgetown NAACP through its members</u>

166.    The South Carolina and Georgetown NAACP (collectively "NAACP") and individual NAACP members were harmed by the Council's denial of the Porter's Landing Zoning Application.

167.    The NAACP expended significant resources and volunteer time to advocate for the approval of the Zoning Application and the creation of the new housing units. Those resources and time were in keeping with the NAACP's longstanding efforts in Georgetown and across South Carolina to promote new affordable housing development, which Black residents in Georgetown and in South Carolina disproportionately need. But these expenditures came at the cost of other NAACP advocacy, outreach, education, and housing search assistance efforts. During the same period, for example, the NAACP was also actively involved in building a record for redistricting; NAACP advocacy efforts on that front were adversely affected because of the NAACP's need to focus attention and resources on the fairness of the Georgetown zoning process.

168.    Other NAACP efforts and services were negatively impacted. The NAACP's expenditures of time and money interfered with its ability to fundraise; conduct trainings for members interested in becoming elected officials, staff; run meetings; and meet with its members all of which are fundamental services the NAACP traditionally provides on behalf of its

members in furtherance of its organizational mission and goals. Additionally, time and resources that might otherwise have been used to assist NAACP members in finding housing or housing assistance was instead directed at advocating for the development.

169. In April and May 2021, the NAACP hosted regular virtual and in-person meetings to explain the proposed development to its membership, combat misinformation about the development, and galvanize support for the Zoning Application. NAACP leaders and members in Georgetown attended all of the public Council meetings to engage with elected leadership and demonstrate support for the Zoning Application. Further, in the run-up to the Council action on the Zoning Application, NAACP leaders in Georgetown passed out over 2,000 flyers and knocked on approximately 215 doors to speak directly with Georgetown County residents who could be eligible to move into the new units.

170. NAACP members were likely to move into Porter's Landing, thereby benefiting directly from the construction of new affordable housing. As described, Black Georgetown renters are nearly twice as likely as White renters to meet the income eligibility requirements for the proposed new units; they are also nearly eight times as likely to receive housing subsidies. So, the added housing stock would have provided more—and better—options that would have been disproportionately available to Black renters.

171. Many NAACP members are income-eligible or receive HCVs, and individual NAACP members would have sought to move into the new housing units at Porter's Landing. During the NAACP's canvassing efforts to support the rezoning application, for example, NAACP leaders spoke with members who expressed interest in trying to relocate to these new units. The denial of the Zoning Application has exacerbated the housing insecurity and lack of access to opportunity faced by these members.

172. For example, many members expressed a fear of homelessness because of the lack of affordable housing in the area. As rents continue to increase and fewer landlords accept HCVs, these members have spent several months looking for more affordable housing with little to no success.

173. For those who are able to find affordable housing, the conditions of these units are often times appalling and unsafe. Many NAACP members reported issues such as black mold, lack of air conditioning or heat, leaking ceilings, and run-down buildings. These conditions create severe health and safety concerns for residents; however, they are often unable to find new, safer housing within their means. For example, one member reported black mold throughout her apartment and believed it was contributing to asthma attacks in her grandchildren. However, she is unable to move: she cannot find new housing in the area that will accept her voucher.

174. For individuals with Housing Choice Vouchers, the shortage of affordable housing and property owners willing to accept their vouchers has put them at risk of losing their voucher. One member reported concern that her voucher would expire before she was able to find housing.

    ii.    <u>Plaintiffs FourSix Development and We Do Good Work</u>

175. Had the County approved the Zoning Application, Porter's Landing would almost certainly have been awarded 9% LIHTC funding based on its preliminary score during phase one of the application process and based on the commitments that the developers were willing to make during phase two.

176.    On March 18, 2021, SC Housing released its scoring of preliminary 9% LIHTC applications. The proposed Porter's Landing development scored 58 points out of a possible 75 during phase one, or 13th out of 73 preliminary applications for new construction funding.

177.    SC Housing would ultimately award tax credits to 18 new construction developments during the 2021 cycle. Seven of the developments awarded credits in the 2021 cycle had lower phase one scores than Porter's Landing.

178.    Of the 55 points available during phase two of the application process, 35 are awarded based on the developer's history with the LIHTC program and on commitments that the developer alone can make. Plaintiff FourSix, and its partner BlueLine, qualified for and were willing and able to make the commitments necessary to obtain all of these points. As a result, Porter's Landing would have received a minimum final score of 93 which would have been sufficient to obtain an award of 9% tax credits during the 2021 cycle.

179.    In addition, Plaintiff FourSix expected that at least 30% of the funding for development of Porter's Landing would be derived from sources other than SC Housing resulting in an additional five points being awarded during phase two.

180.    Council's denial of the Zoning Application and of the Porter's Landing development resulted in significant financial costs to Plaintiff FourSix and also damaged its future prospects of developing affordable housing in South Carolina.

181.    Had the Porter's Landing development been completed, the developers stood to earn a fee of $1.17 million, $573,300 of which would have been paid to Plaintiff FourSix as the minority partner in the development.

182.    It took three partners at FourSix approximately six weeks of work to put the Porter's Landing proposal together, time worth at least $132,000.00.

183.    In addition, FourSix incurred nearly $16,000.00 in out-of-pocket costs and lost the opportunity to recover a commission on the sale of the Porter's Landing site of approximately $24,000.00.

184.    Finally, under applicable state guidelines for the submission and review of LIHTC applications, completion of Porter's Landing would have enabled FourSix to independently develop affordable housing in South Carolina using LIHTC financing without the need to engage a development partner with more experience developing LIHTC housing.

185.    On May 24, 2021, the day before the Third Reading, SC Housing began accepting final applications for the 2021 LIHTC cycle.

186.    This application period closed on May 28, 2021, and credits for the 2021 cycle have been awarded.

187.    Because the Zoning Application was denied, Plaintiff FourSix did not submit a final application for the 2021 LIHTC cycle. Such an application would have been futile given that the Porter's Landing site was not zoned appropriately for the proposed development.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Violation of the Fair Housing Act, 42 U.S.C. § 3604 – Disparate Treatment)

188.    Plaintiffs repeat and reallege the allegations in the paragraphs above as if fully set forth herein.

189.    As described above, Defendants' acts, policies and practices have made and continue to make housing unavailable because of race or color in violation of the Fair Housing Act, 42 U.S.C. § 3604(a).

190.    Plaintiffs are aggrieved person as identified in 42 U.S.C. § 3602(d) and (i), have been injured by the Defendants' discriminatory conduct, and have suffered damages as a result.

191.    Defendants' acts, practices, and policies in denying the Zoning Application for the Porter's Landing site have a discriminatory effect on Georgetown County's Black population.

192.    The process through which Defendants denied the Zoning Application for the Porter's Landing site was characterized by departures from procedural and substantive norms.

193.    Georgetown County has a long history of discrimination on the basis of race.

194.    Contemporaneous statements by members of County Council and members of the public opposing the zoning change demonstrate that race, including the race of prospective residents of the Porter's Landing site, was a motivating factor in Defendants' decision to deny the zoning change for the Porter's Landing site.

195.    Defendants' acts, policies, and practices have made and continue to make housing unavailable on the basis of race and/or color in violation of 42 U.S.C. § 3604(a), and Plaintiffs through this action merely seek to enjoin Defendant from interfering with the construction of the Porter's Landing site.

196.    Plaintiffs have suffered and will continue to suffer real, cognizable, and irreparable harm as a result of Defendants' discriminatory practices for which Plaintiffs have no adequate remedy at law.

197.     Defendants' conduct as described above was intentional, willful, and made in disregard for the rights of others.

198.     As a result, Plaintiffs are entitled to recover actual and punitive damages and to injunctive relief pursuant to 42 U.S.C. § 3613.

## SECOND CLAIM FOR RELIEF
### (Violation of the Fair Housing Act, 42 U.S.C. § 3604 – Disparate Impact)

199.     Plaintiffs repeat and reallege the allegations in the paragraphs above as if fully set forth herein.

200.     As described above, Defendants' acts, policies, and practices have made and continue to make housing unavailable because of race or color in violation of the Fair Housing Act, 42 U.S.C. § 3604(a).

201.     Plaintiffs are aggrieved person as identified in 42 U.S.C. § 3602(d) and (i), have been injured by the Defendants' discriminatory conduct, and have suffered damages as a result.

202.     Defendants' acts, practices, and policies have a disproportionate adverse impact on Black individuals as compared to White individuals in the housing market for Georgetown County, South Carolina.

203.     Defendants' conduct as described above was intentional, willful, and made in disregard for the rights of others.

204.     This disproportionate impact is a direct result of Defendants' decision to deny the Zoning Application for the Porter's Landing site.

205.     Defendants' policies are not necessary to serve any substantial, legitimate, non-discriminatory interest and any such interest could be served by less discriminatory alternatives.

206. Plaintiffs have suffered and will continue to suffer real, cognizable, and irreparable harm as a result of Defendants' discriminatory practices for which Plaintiffs have no adequate remedy at law.

207. Defendants' unlawful actions have been and continue to be willful and in careless disregard of Plaintiffs' rights.

208. As a result, Plaintiffs are entitled to recover actual and punitive damages and to injunctive relief pursuant to 42 U.S.C. § 3613.

## THIRD CLAIM FOR RELIEF
### (Violation of the Fair Housing Act, 42 U.S.C. § 3604 – Perpetuation of Segregation)

209. Plaintiffs repeat and reallege the allegations in the paragraphs above as if fully set forth herein.

210. Defendants' acts, practices, and policies have perpetuated segregation in the Georgetown County, South Carolina housing market.

211. This perpetuation of segregation is a direct result of Defendants' decision to deny the Zoning Application for the Porter's Landing site. Defendants violated 42 U.S.C. § 3604(a) by making dwellings unavailable to Plaintiffs in higher-opportunity areas, and thereby perpetuating segregation in the Georgetown County, South Carolina housing market.

212. Plaintiffs continue to live in racially segregated areas and to be harmed by Defendant's actions. Plaintiffs are entitled to privately enforce Defendants' violations of these statutory provisions through 42 U.S.C. § 3613.

## FOURTH CLAIM FOR RELIEF

### (42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States)

213.    Plaintiffs repeat and reallege the allegations in the paragraphs above as if fully set forth herein.

214.    Defendant Georgetown County is a state actor.

215.    Defendants' use of discriminatory practices in contravention of Plaintiffs' constitutional and federal statutory rights motivated by motivated by malice and/or callous disregard for the rights of Plaintiffs, deprive Plaintiffs of their right of equal access to housing in violation of  42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution with regard to housing.

216.    Defendants' acts, practices, and policies in denying the Zoning Application for the Porter's Landing site have a discriminatory effect on Georgetown County's Black population.

217.    The process through which Defendants denied the Zoning Application for the Porter's Landing site was characterized by departures from procedural and substantive norms.

218.     Georgetown County has a long history of discrimination on the basis of race.

219.    Contemporaneous statements by members of County Council and members of the public opposing the Zoning Application demonstrate that race, including the race of prospective residents of the Porter's Landing site, was a motivating factor in Defendants' decision to deny the zoning change for the Porter's Landing site.

220.    Defendants' policies are not necessary to serve any substantial, legitimate, non-discriminatory interest and any such interest could be served by less discriminatory alternatives. As described above, Defendants' conduct above was intentional, willful, and made in disregard for the rights of others.

## FIFTH CLAIM FOR RELIEF
### (Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981)

221.    Plaintiffs repeat and reallege the allegations in the paragraphs above as if fully set forth herein.

222.    Defendants' discriminatory practices, motivated by malice and/or callous disregard for the rights of Plaintiffs, deprive Plaintiffs of their right of equal access to housing, otherwise make housing unavailable, and perpetuate segregation on the basis of race in violation of the Fair Housing Act, 42 U.S.C. §§ 3604(a), both by intent and impact. As described above, Defendants' conduct above was intentional, willful, and made in disregard for the rights of others.

## SIXTH CLAIM FOR RELIEF
### (Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1982)

223.    Plaintiffs repeat and reallege the allegations in the paragraphs above as if fully set forth herein.

224.    As described above, Defendants' conduct above was intentional, willful, and made in disregard for the rights of others.

225.    Defendants' discriminatory practices, motivated by malice and/or callous disregard for the rights of Plaintiffs, deprive plaintiffs of their right to lease property on the basis

of race (and thus deprive them of the same such rights as are enjoyed by White persons) in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1982. As described above, Defendants' conduct above was intentional, willful, and made in disregard for the rights of others.

### **PRAYER FOR RELIEF**

THEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants and grant Plaintiffs the following relief:

A.  Declare that Defendants' acts, practices, and policies as outlined herein are discriminatory on the basis of race in violation of the Fair Housing Act, 42 U.S.C. § 3601, et seq., 42 U.S.C. § 1983, the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States, the Civil Rights Act of 1866, 42 U.S.C. § 1981, et seq.

B.  Permanently enjoin:

i.  Defendants and their directors, officers, agents, and employees from continuing to publish, implement, and enforce the unlawful and discriminatory acts, practices, or policies described herein; ;

ii.  Defendants and their directors, officers, agents, and employees from engaging in any other acts that disparately impact, or that perpetuate or contribute to the segregation of, Black households and households receiving housing assistance in the region surrounding and including Georgetown County.

C.  Order Defendants to:

i.  Take all affirmative steps necessary to remedy the effects of the unlawful and discriminatory conduct described herein and to prevent such or similar conduct from occurring in the future;

ii.     Promptly approve an application by Plaintiffs, their successors or assigns, to amend the permitted uses of the Porter's Landing site to include multi-family housing if such an application is presented to Defendants within 180 days of entry of any order granting such relief or such longer time as the Court may deem just and reasonable;

iii.     Take affirmative steps, supervised by this Court, to promote the development of affordable housing in Georgetown County that is accessible to a racially and economically diverse group of low- and moderate-income households, and ensure that such housing is in fact occupied by low- and moderate-income households, in accordance with prevailing standards and requirements for affirmative marketing;

iv.     Take affirmative steps, supervised by this Court, to overcome the effects of past and present discriminatory policies and practices, including conducting, funding and promoting remedial activities and adopting remedial measures necessary to reverse the disproportionate exclusion of Black, Latino, and voucher-holding households from Georgetown County, and thereby address regional patterns of segregation on the basis of race, color, national origin, ancestry, and lawful source of income, under the supervision of this Court;

D.     Award Plaintiffs compensatory damages in an amount to be determined by the jury that would fully compensate Plaintiffs for the loss that Defendants' conduct has caused, or nominal damages in the alternative;

E.     Award Plaintiffs the costs of this action including reasonable attorneys' fees;

F.     Such other and further relief as the Court deems just and proper.


Respectfully Submitted,


Columbia, SC                              *s/ Adam Protheroe*
November 16, 2022                    Adam Protheroe, Fed. ID 11033
                                              Email: adam@scjustice.org
                                              **S.C. Appleseed Legal Justice Center**
                                              P.O Box 7187
                                              Columbia, SC 29202
                                              Telephone – 803.816.0607
                                              Facsimile – 803.779.5951


                                              Thomas Silverstein
                                              Email: tsilverstein@lawyerscommittee.org
                                              Malcolm Peyton Cook
                                              Email: mpeyton-cook@lawyerscommittee.org
                                              **Lawyers' Committee for Civil Rights under Law**
                                              1500 K Street NW, Suite 900
                                              Washington, DC 20005
                                              Telephone: 202.662.8316
                                              Facsimile: 202.783.0857
                                              (*pro hac vice applications forthcoming*)


                                              Janette McCarthy Wallace
                                              Email: jlouard@naacpnet.org
                                              Martina Tiku
                                              Email: mtiku@naacpnet.org
                                              **National Association for the Advancement of Colored People**
                                              4805 Mt. Hope Drive
                                              Baltimore, MD 21215
                                              Telephone: 410.580.5777
                                              (*pro hac vice applications forthcoming)*


                                              Matthew Allman
                                              Email: mjallman@venable.com
                                              **Venable LLP**
                                              8010 Towers Crescent Drive, Suite 300
                                              Tysons, Virginia 22182
                                              Telephone: 703.760.1600
                                              Facsimile: 703.821.8949
                                              (*pro hac vice application forthcoming*)


                                              *Attorneys for the Plaintiffs*


COMPLAINT                                                                    Page **58** of **58**