UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| South Carolina State Conference and Georgetown County Branch of the National Association for the Advancement of Colored People, FourSix Development, and We Do Good Work, LLC, | ) ) ) ) ) ) | Civil Action No. 2:22-cv-04077-BHH<br><br>**Opinion and Order** |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| Georgetown County, a political subdivision of the State of South Carolina, and the members of the Georgetown County Council in their official capacities, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the Court upon Plaintiffs' amended complaint alleging violations under the Fair Housing Act ("FHA"), the Equal Protection Clause of the Fourteenth Amendment, and 42 U.S.C. §§ 1981, 1982, and 1983. (ECF No. 6.) Defendants Georgetown County, a political subdivision of the State of South Carolina ("Georgetown County"), and the members of the Georgetown County Council in their official capacities ("the Council") (collectively referred to as "Defendants"), have filed a motion to dismiss the amended complaint pursuant to Rules 8, 12(b)(1), and 12(b)(6) of the Federal Rules of Civil Procedure (ECF No. 12.) After review, and for the reasons set forth below, the Court denies Defendants' motion to dismiss.

## BACKGROUND

The following facts are alleged in Plaintiffs' amended complaint. Plaintiffs, a group of four organizations, initially filed this action on November 16, 2022, alleging claims arising from Defendants' denial of a zoning application filed by Georgetown Memorial Hospital to include multifamily housing among the permitted uses on a 16-acre tract of undeveloped land owned by the hospital in Georgetown County. (ECF No. 6 ¶¶ 10, 51-52, 69.) This land was to be developed into Porter's Landing, an affordable housing development, and the development's construction hinged on the approval of the zoning application. (*Id.* ¶¶ 1, 10.) Plaintiffs allege that Defendants' decision to oppose Porter's Landing was not based on Georgetown County's housing needs or sound land use planning but instead: was motivated by racism; has resulted in substantial and disproportionate harm to Black households; and will perpetuate existing patterns of racial segregation in Georgetown County. (*Id.* ¶ 1.) Plaintiffs seek declaratory, injunctive, and monetary relief in connection with their claims. (*Id.* ¶ Prayer for Relief.)

### The Parties

Plaintiff organizations are the South Carolina State Conference of the National Association for the Advancement of Colored People ("NAACP") and the Georgetown County Branch of the NAACP (collectively referred to as "NAACP Plaintiffs"), as well as FourSix Development, LLC ("FourSix") and We Do Good Work, LLC ("Good Work") (collectively referred to as "Developer Plaintiffs"). The NAACP's mission is to achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color. (*Id.* ¶ 13.)

Developer Plaintiffs are private limited liability companies registered to do business in South Carolina. (*Id.* ¶¶ 15-6.) FourSix's mission is to embolden the underserved to live a healthy, modern lifestyle and to gain an increased opportunity to excel within a community, and FourSix has extensive experience with the design, approval, construction, and management of affordable residential housing developments. (*Id.*) FourSix established Good Work for the purpose of acquiring, developing, and holding title to the Porter's Landing site. (*Id.* ¶ 16.)

Defendant Georgetown County is a political and geographical subdivision of the State of South Carolina created for the purpose of providing government services. (*Id.* ¶ 17.)  The Council is a legislative body with legislative authority to approve, deny, or defer applications for certain zoning entitlements and development approvals, including planned development districts. (*Id.* ¶ 18.)

<u>Porter's Landing</u>

The Porter's Landing site is part of a larger undeveloped 65-acre tract, TMS No. 02-1009-02-00, (the "Property") located approximately 1.5 miles north of the Georgetown city limits at the intersection of U.S. Highway 701 and Wedgefield Road. (*Id.* ¶ 51.) Georgetown Hospital System purchased the Property in December of 2008 and transferred it to its current owner, Georgetown Memorial Hospital, in August of 2009. (*Id.* ¶ 52.)

In November 2008, the Council approved rezoning the Property to the Planned Development District ("PDD"), which—according to the Georgetown County Zoning Ordinance—has a purpose to:

> [P]rovide opportunities to create more desirable environments through the application of flexible and diversified land development standards under a

> comprehensive plan and program that is professionally prepared. The Planned Development District is intended to be used to encourage the application of new techniques and technology to community development which will result in superior living or development arrangements with lasting values. It is further intended to achieve economics in land development, maintenance of street systems and utility networks while providing building groupings for privacy, usable attractive open space, buffer zones, safe circulation and the general well-being of the inhabitants.

(*Id*. ¶ 53.) The approved rezoning allows development of the Property with a single-use PDD consisting of a single four-story hospital building (275,000 sf); three two-story accessory use buildings (with an aggregate density of 115,000 sf); three three-story medical office buildings (with an aggregate density of 210,000 sf); and three "optional" pad sites to facilitate future infill development. (*Id*. ¶ 54.)

According to the amended complaint, Georgetown Memorial Hospital does not intend on implementing the PDD for the Property as currently approved; instead, in January 2021, it entered into an agreement to sell the Porter's Landing site to Good Work. (*Id*. ¶¶ 15, 56.) Good Work intended for Porter's Landing to consist of 90 units of affordable housing featuring a mixture of one-, two-, and three-bedroom duplexes, triplexes, and fourplexes, along with a proposed clubhouse and playground for the private use of Porter's Landing residents. (*Id*. ¶¶ 15, 58.) FourSix intended to develop Porter's Landing using Low-Income Housing Tax Credit ("LIHTC")[1] financing with the objective of serving households making 40% to 50% of the area median income as determined by the U.S. Department of Housing and Urban Development. (*Id*. ¶ 59.)

---

[1] Congress created the LIHTC program in the Tax Reform Act of 1986 to address a nationwide shortage of affordable housing. *See* Pub. L. No. 99–514 § 252 (1986). The LIHTC program offers incentives to private developers to finance affordable, low-income housing developments by providing developers with a tax credit that helps to offset federal income tax liability. *Wesley Hous. Dev. Corp. of N. Va. V. SunAmerica Hous. Fund 1171*, 577 F. Supp. 3d 448, 453 (E.D. Va. 2021). "Through the LIHTC program, the federal government allocates tax credits to state housing authorities, and the state housing authorities, in turn, select housing developers to build qualifying housing projects and thereby the developers receive tax credits." *Id.*

On February 19, 2021, FourSix submitted a preliminary 9% LIHTC application to South Carolina Housing for the proposed Porter's Landing development. (*Id.* ¶¶ 17, 66.) Multifamily housing is not a permitted use under the current zoning for the Porter's Landing site even though more intensive hospital use is allowed. (*Id.* ¶ 67.) "In order to facilitate Plaintiff FourSix's development program, on February 19, 2021, Georgetown Memorial Hospital (in its capacity as the owner of the Porter's Landing site) filed an application to amend the approved [PDD] for the Property to include multifamily housing uses among the list of permitted uses for the Porter's Landing site." (*Id.* ¶ 69.) According to Plaintiffs, approval of the zoning application "would have been consistent with the Georgetown County Comprehensive Plan, in alignment with Georgetown County's housing needs, and would have brought the Planned Development District into compliance with South Carolina law." (*Id.* ¶ 70. *See also id.* ¶¶ 71-85 (providing factual allegations in support of this assertion).)

<u>Hearings on the Zoning Application</u>

On April 15, 2021, the Georgetown County Planning Commission held a public hearing on the zoning application, and the Commission voted unanimously (7-0) to recommend approval of the application, subject to certain conditions, which Plaintiffs contend would not have adversely affected the viability of Porter's Landing. (*Id.* ¶¶ 94-96.) On April 20, 2021, a representative of FourSix met with Planning Commission staff and Council Members Bob Anderson ("Anderson") and Raymond Newton ("Newton"). (*Id.* ¶ 98.) While Anderson had expressed his support for Porter's Landing during a prior meeting with FourSix, according to the amended complaint, "he now indicated his opposition to the development and stated that he did not want to be part of a 'social

experiment' for poor people." (*Id.*) Additionally, Anderson "indicated that he wanted the County to fund its own affordable housing so they could choose where it was and who lived there," and "Newton raised concerns about different social and economic classes living near one another." (*Id.*)

On April 27, 2021, the Council held a public hearing for the First Reading of Ordinances for the zoning application, which was followed by a Second Reading of Ordinances for the zoning application on May 11, 2021. (*Id.* ¶¶ 101, 104.) The Council voted 4-2-1 in favor of (i) amending the ordinance for the zoning application to include the full text of the ordinance and (ii) reading the ordinance, as so amended, into the public record for a second time. (*Id.* ¶ 107.) Specifically, four Council Members (Louis Morant, Lillie Johnson, Steve Goggans, and John Thomas) voted in favor of the zoning application; Anderson and Newton voted against the zoning application; and one Council Member, Everett Carolina, abstained from the vote. (*Id.*)

On May 25, 2021, the Council held a public hearing for the Third Reading of Ordinances for the zoning application, and after discussion, the Council voted 3-3 on the ordinance for the zoning application. (*Id.* ¶¶ 108, 115.) Because the vote was deadlocked, the ordinance for the zoning application was denied. (*Id.* ¶ 116.) This action ensued.

## LEGAL STANDARDS

### I.    Standing

Article III of the U.S. Constitution limits the jurisdiction of federal courts to actual "Cases" and "Controversies." U.S. Const. art. III, § 2. One element of the case and controversy requirement is that plaintiffs must demonstrate that they have standing to sue. *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 408 (2013). Although only one of the plaintiffs must demonstrate standing, *see Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir.

2014) ("the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." (quoting *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006))), at least one plaintiff must show standing as to each cause of action. *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (internal quotation marks omitted)).

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a defendant to challenge the court's subject matter jurisdiction over the plaintiff's suit. When assessing whether a plaintiff possesses Article III standing to sue, a court "accept[s] as valid the merits of [the plaintiff's] legal claims." *See Fed. Election Comm'n v. Cruz*, — U.S. —, 142 S. Ct. 1638, 1647 (2022); *see also Warth v. Seldin*, 422 U.S. 490 (1975) (recognizing that "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal"). Further, a court "must look to the facts at the time the complaint was filed." *Wild Va. v. Council on Env't Quality*, 56 F. 4th 281, 293 (4th Cir. 2022).

## II. Sufficiency of Pleadings

Rule 8(a) sets forth a liberal pleading standard, which requires only a "'short and plain statement of the claim showing the pleader is entitled to relief,' to 'give the defendant fair notice of what . . . the claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "[T]he facts alleged 'must be enough to raise a right to relief above the speculative level' and must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Robinson v. Am. Honda Motor Co., Inc.*, 551 F.3d 218, 222 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555, 569). "The plausibility standard is not akin to a probability

requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

While a complaint does not need to contain detailed factual allegations, pleadings that contain mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Essentially, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n] . . . that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). When considering a motion to dismiss pursuant to Rule 12(b)(6), the court must take all well-pled material allegations of the complaint as admitted and view them in the light most favorable to the non-moving party. *De Sole v. U.S.*, 947 F.2d 1169, 1171 (4th Cir. 1991) (citing *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969)).

## DISCUSSION

In their motion to dismiss Plaintiffs' amended complaint, Defendants argue: (1) Plaintiffs lack standing to sue, (2) Plaintiffs fail to comply with Rule 8, and (3) Plaintiffs fail to state a claim upon which relief can be granted. (ECF No. 12-1.) The Court will consider each of Defendants' arguments in turn.

### I.    Standing

To establish Article III standing, a plaintiff must allege facts demonstrating: (1) the existence of a "concrete and particularized" injury-in-fact; (2) "a causal connection between the injury and the conduct complained of"; and (3) that a favorable adjudication would likely redress the alleged injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61

(1992). Organizations, like Plaintiffs, may establish standing under two theories: (a) organizational standing, or (b) representational standing, which is also known as "associational" standing and is based on the fact that members it represents have been harmed. *Md. Highways Contractors Ass'n, Inc. v. Maryland,* 933 F.2d 1246, 1250 (4th Cir. 1991). In their motion, Defendants assert that Plaintiffs lack standing under either theory. As explained below, however, the Court finds that *Developer Plaintiffs* have sufficiently established organizational standing; therefore, the Court need not address Defendants' arguments regarding the remaining Plaintiffs. *E.g., Bostic*, 760 F.3d at 370; *Am. Coll. of Obstetricians & Gynecologists v. U.S. Food & Drug Admin.*, 2020 WL 3960625, at *8 (D. Md. July 13, 2020) (analyzing only whether one plaintiff has standing).

In determining whether organizational standing exists, "a court conducts the same inquiry as in the case of an individual." *Maryland*, 933 F.2d at 1250. That means courts evaluate whether the organization meets the three elements mentioned above—injury in fact, causation, and redressability. *Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. Open Band & Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013).

### A.  Injury in Fact and Causation

In their motion to dismiss, Defendants argue that the amended complaint "appears completely devoid of any obviously pleaded harms" to FourSix and Good Work and fails to include "any factual details as to what actual damages [were] suffered." (ECF No. 12-1 at 12-13.) Defendants then argue that the amended complaint contains two possible areas of alleged harm to Developer Plaintiffs: (1) that Developer Plaintiffs entered into an agreement with Georgetown Memorial Hospital to purchase the land, and (2) that Developer Plaintiffs had filed a preliminary 9% LIHTC application on behalf of themselves

9

and "its partner on the Porter's Landing project, Blue Line Development, Inc.," who has not joined this suit. (*Id*.)

Plaintiffs, in contrast, assert that Developer Plaintiffs suffered economic harms as a result of Defendants' actions, including the following: the loss of a $573,000 developer fee; time expended developing the Porter's Landing proposal worth at least $132,000; nearly $16,000 in out-of-pocket costs; loss of the opportunity to recover a commission of approximately $24,000; and loss of the opportunity to develop affordable housing in the future using LIHTC financing without the need to engage a senior development partner. (ECF No. 13 at 6-7.) Plaintiffs also point out that FourSix is a private, limited liability company whose "mission is to embolden the underserved to live a healthy, modern lifestyle and to gain an increase opportunity to excel within a community." (ECF No. 6 ¶ 5.) They further allege that FourSix "has extensive experience with the design, approval, construction, and management or affordable residential housing developments." (*Id*.)

In their reply, Defendants contend that damages based on the loss of economic opportunity are hypothetical or conjectural, not concrete. (ECF No. 14 at 5.) Defendants further argue that they cannot be responsible for Developer Plaintiffs' alleged monetary damages because such damages amount to the cost of doing business. (*Id*.)

After review, the Court first notes that it is well established that "[t]o satisfy standing's causation requirement, the alleged injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *DiCocco v. Garland*, 52 F.4th 588, 592 (4th Cir. 2022) (internal alterations omitted) (quoting *Lujan*, 504 U.S. at 562). Nevertheless, "[a]t the motion-to-dismiss stage, this burden is relatively modest[.]" *Id*. (internal quotation marks

omitted).  Ultimately, after considering the parties' arguments and the applicable law, the Court finds that Developer Plaintiffs have sufficiently alleged a concrete and particularized injury-in fact to their legal protected right to "perform[] those activities for which [they] w[ere] formed" caused by Defendants' denial of the zoning application. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 611 (1982) (Brennan, J., concurring).

In so finding, the Court finds instructive the case of *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 254-55 (1977). In *Arlington Heights*, the developer plaintiff, MHDC, which was planning on using federal assistance to build a low-cost housing development called Lincoln Green, submitted a rezoning application for a 15-acre parcel from single-family to multiple-family classification. 429 U.S. at 254-55. The Village of Arlington Heights denied the rezoning request, and MHDC filed suit, alleging that the denial was racially discriminatory and that it violated the Fourteenth Amendment and the Fair Housing Act of 1968. *Id*. Of import here, the Supreme Court held that a developer plaintiff has standing when its interest in building affordable housing stemmed "not from a desire for economic gain, but rather from an interest in making suitable low-cost housing available in areas where such housing is scarce." *Id*. at 263. In making such determination, the Court rejected the defendants' argument that the plaintiff suffered no economic injury from a refusal to rezone; rather, it held that:

> . . . it is inaccurate to say that MHDC suffers no economic injury from a refusal to rezone, despite the contingency provisions in its contract. MHDC has expended thousands of dollars on the plans for Lincoln Green and on the studies submitted to the Village in support of the petition for rezoning. Unless rezoning is granted, many of these plans and studies will be worthless even if MHDC finds another site at an equally attractive price.

*Id*. at 262.

11

Here, although Developer Plaintiffs are not nonprofit organizations like the plaintiff in *Arlington Heights*, Developer Plaintiffs' mission and prior experience in developing and managing low-cost housing indicates that profit was not the sole driver for their actions and, like the plaintiff in *Arlington Heights*, Developer Plaintiffs had "an interest in making suitable low-cost housing available in areas where such housing is scarce." *Id.* at 263. (ECF No. 6 at 5.)

Furthermore, the Court is not persuaded by Defendants' reliance on the Supreme Court's decision in *Warth v. Seldin*. 422 U.S. 490 (1975). (ECF No. 12-1 at 14-15.) In *Warth*, the petitioners' complaint alleged that Penfield's zoning ordinance had the purpose and effect of excluding persons of low and moderate income from residing in the town. *Warth*, 422 U.S. at 495. The Supreme Court addressed the standing of all petitioners, including Home Builders, which sought to intervene and represent its member firms engaged in the development and construction of residential housing in the Rochester area, including the town of Penfield. *Id.* at 514-15. In finding that Home Builders lacked standing, the Supreme Court relied on the absence of several significant facts, such as the following: (1) Home Builders did not allege "monetary injury to itself"; (2) the complaint did not refer to any "specific project of any of Home Builders' members that was currently precluded by the zoning ordinance or by respondents' action in enforcing it"; and (3) there was no indication that respondents had "delayed or thwarted any project currently proposed by Home Builders' members." *Id.* at 515-16. Notably, contrary to *Warth*, Developer Plaintiffs <u>do</u> allege such facts in this case.  For example, Developer Plaintiffs claim that Defendants' action of denying the zoning application directly hindered their ability to move forward with a specific project already in the works, i.e., the development

of Porter's Landing. (ECF No. 6 ¶ 172.) Developer Plaintiffs also allege that Defendants' action of denying the zoning application resulted in significant financial costs and damaged FourSix's future prospects of developing affordable housing in South Carolina. (*Id.*) After review, the Court finds such allegations sufficient to afford Developer Plaintiffs standing to assert their claims for relief under the FHA. *See also McCauley v. City of Jacksonville, N.C.*, 829 F.2d 26, 1987 WL 44775, at *2 (4th Cir. 1987) (finding McCauley, a developer of racially integrating housing, has standing to bring a claim under the FHA to redress the city's alleged ban of his project on racial grounds where he "alleged the existence of a controversy arising from an injury caused by the city").

### B. Redressability

Next, Defendants argue that, even if Developer Plaintiffs can establish an injury in fact, it would not be redressable by a favorable decision. (ECF No. 12-1 at 16.) Essentially, Defendants claim that Plaintiffs cannot show there is *"at least* a substantial probability that . . . [Porter's Landing] will materialize" because a conservation easement exists that "would prohibit such a project from ever being built on that property." (ECF No. 12-1 at 16-17 (citing *Arlington Heights*, 429 U.S. at 264) (emphasis added).) Indeed, according to Defendants, "there is a certainty the alleged proposed development cannot [be] built there due to the conservation easement." (ECF No. 14 at 11.) After review, however, the Court disagrees.

To establish redressability in cases involving the FHA, a plaintiff must plead facts showing a denial of the opportunity to compete for housing. *Comer v. Cisneros*, 37 F.3d 775, 794 (2d Cir. 1994). According to Plaintiffs' amended complaint, prior to the denial of the zoning application, the Council was amendable to the development of Porter's

Landing, and Developer Plaintiffs were ready and willing to begin construction upon approval. (*See, e.g.,* ECF No. 6 ¶¶ 55-86.) Moreover, the validity of the 2008 conservation easement amendment remains contested, as its validity is the subject of pending litigation.[2] (ECF No. 13 at 22.) Further, this action was filed nearly a year after Defendants denied the zoning application, and there are no allegations to indicate that Defendants raised the conservation easement as a potential impediment to building Porter's Landing either prior to or at the time of their allegedly discriminatory conduct.

Considering the foregoing, the Court is not persuaded that the conservation easement makes it *impossible* for Developer Plaintiffs to build Porter's Landing on the designated property. Rather, based on the relevant case law, the Court finds that the uncertainties surrounding whether Porter's Landing would be built, to include the impact of the easement, do not destroy the standing of Developer Plaintiffs. *See, e.g., Arlington Heights,* 429 U.S. at 261 (explaining that judicial relief "would not, of course, guarantee that [the proposed housing project] would be built. [The developer] would still have to secure financing, qualify for federal subsidies, and carry through with construction. But all housing developments are subject to some extent to similar uncertainties."); *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 689 F.2d 391 (2d Cir.1982) (holding that lack of Section 8 federal subsidy funds does not destroy plaintiffs' stake in housing project), *cert. denied*, 460 U.S. 1069 (1983).

---

[2] *See MST, LLC v. North American Land Trust*, No. 2:22-cv-00874-DCN (D.S.C., filed March 16, 2022). Notably, as of May 19, 2023, the Court stated that it "need not reach the parties' respective arguments regarding the [Conservation Easement] Amendment's validity at this juncture." MST, LLC v. N. Am. Land Tr., No. 2:22-CV-00874-DCN, 2023 WL 3571500, at *5 n.5 (D.S.C. May 19, 2023).

## C. Prudential Limitations

In their reply, Defendants also contend that Developer Plaintiffs have not pleaded "concrete facts establishing particularized harm to themselves or a qualifying [ ] frustration of their purpose to create any sort of standing within the prudential limitations of Article III." (ECF No. 14 at 6.) Essentially, Defendants argue that this case is distinguishable from *Arlington Heights* because there is no individual plaintiff here who has established standing. (*Id.* at 5-6.) According to Defendants, the Supreme Court in *Arlington Heights* "expressed hesitation that the developer in the case would have a right to assert its claims on behalf of third parties." (*Id.* at 6.)

In contrast to Plaintiffs' FHA claims,[3] the Court may invoke prudential limitations on standing in the context of Plaintiffs' other claims. *See Warth*, 422 U.S. at 500 (reviewing prudential standing principles in context of case alleging violations of §§ 1981, 1982 and 1983). The prudential considerations, "essentially matters of judicial self-governance," focus the standing analysis on the related but additional question of "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Id.* at 500.

---

[3] As the District of Maryland explained:

> It is easier to prove that a party has standing to bring a Fair Housing Act claim than a constitutional claim because Fair Housing Act suits have more lenient standing requirements. The Supreme Court has explained that Congress intended standing under the Fair Housing Act to extend to the full limits of Article III," *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 103, n. 9 [ ] (1979), and that "[t]he normal prudential barriers to standing may not be set up as obstacles to the maintenance of actions under the Fair Housing Act." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 [ ] (1983))).

*R.J. Invs., LLC v. Bd. of Cnty. Comm'rs for Queen Anne's Cnty.*, No. CIV.A RDB-07-1903, 2009 WL 5216056, at *4 (D. Md. Dec. 29, 2009).

A close reading of *Arlington Heights* reveals that the Supreme Court found it unnecessary to decide this issue, since at least one of the individual plaintiffs had demonstrated he was a member of the class which was the target of defendants' alleged discrimination. *See Arlington Heights*, 429 U.S. at 263. Notably though, the Fourth Circuit has addressed this issue.

Specifically, in *Scott v. Greenville County*, the plaintiff G.T. Scott, a real estate developer, undertook to construct a low-income apartment complex. 716 F.2d 1409, 1411 (4th Cir. 1983). Scott alleged that his efforts were frustrated by threats of zoning changes stemming from opposition to the coming of black renters into the neighborhood. *Id.* at 1412. He brought an equal protection claim under § 1983 arguing that the county council, in conspiracy with the private landowners, acted with racially discriminatory intent when it directed the withholding of his building permit. *Id.* at 1416.  At the outset of its reasoning to support its finding that Scott had prudential standing, the Fourth Circuit stated: "In the first place, Scott as the developer is a proper plaintiff to assert rights of prospective minority tenants victimized by the alleged racial discrimination." *Id.* at 1415. Thus, while "ordinarily, a plaintiff may not bring an action to redress the rights of a third party," the Fourth Circuit has expressly found that even though a plaintiff is not a member of the class allegedly discriminated against, where such plaintiff has been personally injured due to the defendants' discriminatory conduct, he is entitled to bring an actionable claim under § 1983. *Id.* at 1415-16 ("Contrary to the district court's belief, standing to assert government action violated the equal protection clause is not lacking simply because the plaintiff is not a member of a minority.") *See also R.J. Invs., LLC v. Bd. of Cnty. Comm'rs for Queen Anne's Cnty.*, No. CIV.A RDB-07-1903, 2009 WL 5216056, at *7 (D. Md. Dec.

29, 2009) (holding that plaintiff, a developer, has third party standing to bring a claim under the Civil Rights Act to assert the rights of prospective minority tenants victimized by alleged racial discrimination); *Clifton Terrace Assoc. v. United Tech.*, 929 F.2d 714, 721 (D.C. Cir. 1991) (explaining that the developer is in the best position to vindicate the rights of potential home owners in cases where the direct victims of preemptive discrimination cannot yet be readily identified); *DeVergnes v. Seekonk Water District*, 601 F.2d 9 (1st Cir. 1979) (holding a corporation that planned to construct a low-income housing project had standing to bring suit pursuant to § 1983 alleging that the defendant refused to extend water services because the project would attract blacks to the area).

Ultimately, given the jurisprudence on this issue, the Court finds that prudential considerations do not weigh against Developer Plaintiffs' Article III standing to bring claims against Defendants under the Civil Rights Act of 1866. Accordingly, at this early stage of the litigation, the Court holds that Developer Plaintiffs have established standing to bring the instant claims against Defendants. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013) (noting that "at the summary judgment stage," plaintiffs "can no longer rest on mere allegations [to establish standing] but must set forth by affidavit or other evidence specific facts") (alternation and internal quotation marks omitted).

## II.    Sufficiency of Pleadings

In their motion to dismiss, Defendants also assert that Plaintiffs' amended complaint fails to comply with Rule 8 of the Federal Rules of Civil Procedure.  Specifically, Defendants assert that Plaintiffs have failed to plead sufficient facts to avail themselves of relief under the FHA, the Equal Protection Clause of the Fourteenth Amendment, or 42

17

U.S.C. §§ 1981, 1982, and 1983. The Court will consider the sufficiency of each of Plaintiffs' claims in turn.

### A.  Fair Housing Act

Congress enacted the FHA "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. The FHA makes it unlawful to "refuse to sell or rent  . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a); *see also Luckett v. Town of Bentonia*, No. No. 5:05-cv-144, 2007 WL 1673570, at *3 (S.D. Miss. June 7, 2007) ("The phrase 'otherwise make unavailable or deny' has been interpreted to reach a wide variety of discriminatory housing practices, including exclusionary zoning and the refusal to permit tying into a city's water and sewer systems through the denial of permits and/or the denial of annexation") (collecting cases).

There are two theories of discrimination cognizable under the FHA: disparate treatment (or intentional discrimination) and disparate impact. *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015). Here, Plaintiffs allege both theories against Defendants. As to both theories of liability, Plaintiffs allege that Defendants' denial of the zoning application for Porter's Landing makes housing unavailable because of race in violation of § 3604(a) and, more specifically, has a discriminatory effect and disproportionate adverse impact on Georgetown County's Black population. (ECF No. 6 ¶¶ 181,183, 192, 194.) Plaintiffs' third claim is a generalized perpetuation of segregation claim under the FHA. (*Id.* ¶ 51.)

The Court notes that Defendants do not make specific arguments as to each of Plaintiff's FHA claims in their motion to dismiss. (*See* ECF No. 12-1.) Rather, Defendants

state that Plaintiffs' three claims under the FHA do not allege sufficient facts to establish injury in fact (which the Court has already addressed in the context of standing above), and Defendants more generally claim that "Plaintiffs' Amended Complaint contains the most miniscule of factual allegations in furtherance of their bald and conclusory allegations in the form of simple recitations of elements of various causes of action and a few historical recollections." (ECF No. 12-1 at 17,18.) In their reply, Defendants also assert that Plaintiffs have failed to plead facts that would establish a disparate impact claim under the FHA. (ECF No. 14 at 11.) In support, Defendants appear to argue that this claim should be dismissed because Plaintiffs rely on statements by private individuals and statistics without connection to any specific law, practice, or policy. (*Id.* ¶ 12.)

To determine if Plaintiffs' FHA claims survive Defendants' motion to dismiss, the Court must examine Plaintiffs' factual allegations, taken in the light most favorable to them, to determine if they sufficiently state a claim for disparate treatment, disparate impact, and perpetuation of segregation under the FHA.

### 1. Plaintiffs' factual allegations

In the amended complaint, Plaintiffs allege that "Black households in Georgetown County . . . have a greater need for affordable rental housing relative to White households. (ECF No. 6 ¶ 5 ("While approximately 31% of the Georgetown County population is Black, more than 80% of affordable rental housing units in the County are occupied by Black households, and 94% of Housing Choice Vouchers are held by Black families.").) Plaintiffs allege that Georgetown County, as evidenced by its comprehensive plan, has for more than a decade recognized the need for more affordable housing in the County. (*Id.* ¶ 6.) Yet, according to the amended complaint, under "Defendants' planning and zoning

19

authority, affordable housing has seldom been built, and the little that exists disproportionately benefits White households." (*Id.* ¶ 7.)

Plaintiffs allege "significant patterns of residential racial segregation within Georgetown County" and rely on 2020 census data to conclude that "59% of the Black population would have to move to achieve a balanced distribution between White and Black residents in Georgetown." (*Id.* ¶¶ 44-49.) Plaintiffs similarly conclude from this data that "Black families in Georgetown Country disproportionately rely on existing affordable housing units." (*Id.* ¶¶ 137-141.) Plaintiffs also allege that "LIHTC developments substantially benefit voucher-holders who, in Georgetown County as in many other areas, are disproportionately Black." (*Id.* ¶ 144.)

Plaintiffs further claim that their efforts to develop Porter's Landing were met with threats and hostility from the public, which were grounded in misinformation, stereotypes, racism, and classism, and that key members of the Council ceased their support for the project after the threats and hostility. (*See id.* ¶¶ 9-10, 86, 89-92, 98-99, 117-124.) Moreover, Plaintiffs allege that a Council member used "coded language" to hide opposition to racial integration when he stated (regarding Porter's Landing) that he did not want to be part of a "social experiment" for poor people. (*Id.* ¶¶ 98-99; *see also id.* ¶ 113 (alleging that another comment made by a Council member at the public hearing was "both reflective of and served to stoke race-based opposition to Porter's Landing on the part of Wedgefield Plantation residents on the grounds that Black families would live there").)

According to Plaintiffs, Defendants' rejection of the zoning application runs contrary to the County's stated land use and housing polices, constitutes abnormal

repudiation of the Planning Commission, and is inconsistent with State law for multi-use planned development districts, and is inconsistent with decisions not involving affordable multifamily housing. (*Id.* ¶ 125.) Further, Plaintiffs allege that the Council members who opposed the zoning application offered no justifications having a basis in the guidance of the land use element or housing element of the Georgetown County Comprehensive Plan or other applicable County policy guidance. (*Id.* ¶ 127.)

In sum, Plaintiffs assert that Defendants' denial of the zoning application has the effect of denying safe, decent, affordable housing for Black residents of Georgetown County, which will in turn "increase housing insecurity among Black residents and contribute to a litany of harms including increased housing cost burden, continued exposure to unsafe housing conditions in dilapidated structures, and reduced access to the jobs and community amenities near the proposed location of Porter's Landing." (*Id.* ¶¶ 11, 145-152.) Plaintiffs further contend that the Council's denial of the zoning application will perpetuate segregation in Georgetown County by failing to allow for the racial integration that Porter's Landing would have provided. (*Id.* ¶ 153.)

### 2. Disparate Treatment

"To state a claim for disparate treatment under the FHA, [Plaintiffs] must allege that 'similarly situated persons or groups are subject to differential treatment,' and that 'the defendant had a discriminatory intent or motive.'" *Montgomery Cnty., Maryland v. Bank of Am.*, 421 F. Supp. 3d 170, 181 (D. Md. 2019) (quoting *Potomac Grp. Home Corp. v. Montgomery Cty., Md.*, 823 F. Supp. 1285, 1295 (D. Md. 1993) and *OT, LLC v. Harford Cty., Maryland*, No. GLR-17-2812, 2019 WL 4598009, at *12 (D. Md. Sept. 23, 2019). When determining whether a plaintiff has made plausible factual allegations of racially

discriminatory intent or motive, a court may consider "(1) action that bears more heavily on one race than another, (2) clear patterns of action that are unexplainable on grounds other than race, (3) historical background of the action in question, (4) the sequence of events leading to the defendant's actions, [and] (5) departures from a defendant's regular course of action." *Bank of Am.*, 401 F. Supp. 3d at 644 n.8 (citing *Arlington Heights*, 429 U.S. at 266-67).

"A complainant alleging intentional discrimination has the initial burden of showing that the decision to deny housing opportunities was motivated, at least in part, by unjustified consideration of the [race] of individuals who would be affected by the decision." *Cnty. of Charleston v. Sleepy Hollow Youth, Inc.*, 340 S.C. 174, 182, 530 S.E.2d 636, 641 (Ct. App. 2000). "In this regard, government officials are generally held to act with discriminatory intent, regardless of their personal views, when they implement the discriminatory desires of others." *Id. See also Dailey v. City of Lawton*, 425 F.2d 1037, 1039 (10th Cir.1970) (holding, in a § 1983 racial discrimination action, that "it is enough for the complaining parties to show that the local officials are effectuating the discriminatory designs of private individuals")

Here, Plaintiffs allege that there was intense public opposition to the zoning application and that it was characterized by racist euphemism and derogatory undertones, not only online generally but through emails and letters sent directly to the Council. (ECF No. 6 ¶¶ 117-121; *see id.* ¶ 120 (providing examples of the disparaging and euphemistic comments allegedly contained therein).) Plaintiffs further allege that "[m]any of the public statements made by the Council members opposing the Zoning Application echoed the euphemistic and racially coded language used by many of the

public speakers." (*Id.* ¶ 128.) Specifically, Plaintiffs highlight the following statement purportedly made by Council Member Anderson in opposition to the zoning application: "He noted that he was pushing to develop the west side of the County when he ran for office, but that 'as we turned back the layers of the issue it became obvious to me that it was a lot more complicated than that . . . [FourSix] wanted to put in a 90 unit complex that was gonna be for affordable, well I'm not even gonna say affordable housing, it's gonna be . . . occupied by people who can't afford to pay all of their rent. And that's not quite affordable housing. It's got another name.'" (*Id.* ¶ 113.) According to Plaintiffs, this statement "was both reflective of and served to stoke race-based opposition to Porter's Landing on the part of Wedgefield Plantation residents on the grounds that Black families would live there." (*Id.*)

Plaintiffs also assert that the "County has approved other recent rezoning proposals that did not involve affordable multifamily housing, despite such proposals being inconsistent with the Comprehensive Plan, contrary to the recommendation of the Planning Commission, and/or the subject of similar public opposition to that levied against Porter's Landing." (*Id.* ¶ 131.) To highlight the "unusual" nature of Defendant's conduct in denying the zoning application for Porter's Landing, Plaintiffs allege "only one other instance" where the Council rejected the recommendation of the Planning Commission. (*Id.* ¶ 129 (basing their assertion on a review of records pertaining to 38 rezoning proposals from January 1, 2019, through November 16, 2022).)

"[A]lthough the local government has a legitimate governmental interest in regulating land use, [the Court] ha[s] a duty under the FHA to ensure that such interest is effectuated in a nondiscriminatory manner." *Sleepy Hollow*, 340 S.C. at 183, 530 S.E.2d

at 641. *See* 42 U.S.C. § 3615 (1999) ("[A]ny law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under [the Act] shall to that extent be invalid."). "Determining whether a discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. The Fourth Circuit has noted that,

> officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate . . . . Even individuals acting from invidious motivations realize the unattractiveness of their prejudices when faced with their perpetuation in the public record. It is only in private conversation, with individuals assumed to share their [prejudice], that open statements of discrimination are made, so it is rare that these statements can be captured for the purposes of proving . . . discrimination in a case such as this.

*Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir.1982).

Here, after reviewing the alleged comments about Porter's Landing by Wedgefield residents and by Council members in a light most favorable to Plaintiffs, the Court finds that Plaintiffs have plausibly alleged that a discriminatory purpose was a motivating factor in Defendants' decision to deny the zoning application. Such a finding is further supported by Plaintiffs' allegations that Defendants' denial was inconsistent with Defendants' prior zoning decisions. Accordingly, the Court holds that Plaintiffs have plausibly stated a claim for disparate treatment under the FHA.

### 3. Disparate Impact

Courts analyze disparate impact claims using the following three-step, burden shifting framework:

> Under the first step, the plaintiff must demonstrate a robust causal connection between the defendant's challenged policy and the disparate impact on the protected class. Under the second step, the defendant has

the burden of persuasion to "state and explain the valid interest served by their policies." Under the third step of the framework, and in order to establish liability, the plaintiff has the burden to prove that the defendant's asserted interested "could be served by another practice that has a less discriminatory effect."

*Reyes v. Waples Mobile Home Park Ltd. P'Ship*, 903 F.3d 415 424 (4th Cir. 2018) (quoting *Inclusive Cmtys.*, 576 U.S. at 524) (internal citations omitted). *See also Prince George's Cty., Maryland v. Wells Fargo & Co.*, 397 F. Supp. 3d 752, 766 (D. Md. 2019) (confirming that, at the motion to dismiss stage, only the first step of the framework applies).

At this early stage, Plaintiffs must "demonstrate that the disparity they complain of is the result of one or more of the [ ] practices that they are attacking . . . specifically showing that each challenged practice has a significantly disparate impact" on the protected class." *Reyes*, 903 F.3d at 425 (citing *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 656 (1989)). "A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Inclusive Cmtys.*, 576 U.S. at 543.

In this case, Defendants' denial of the zoning application is the specific practice at issue.[4] Plaintiffs allege that the denial had a disparate impact on Black residents, whom Plaintiffs claim make up a higher proportion of affordable housing residents than White

---

[4] To the extent Defendants argue that Plaintiffs' disparate impact claim should be dismissed because a one-time denial of a zoning application is not a "policy" of discrimination, the Court finds such argument without merit. *See, e.g., Ave. 6E Invs., LLC v. City of Yuma, Arizona*, No. 2:09-CV-00297 JWS, 2018 WL 582314, at **4-7 (D. Ariz. Jan. 29, 2018) (providing a detailed review and analysis of the impact of *Inclusive Communities* on FHA disparate impact claims involving zoning laws that create barriers to housing without sufficient justification; holding that "cases involving a challenge to a single zoning decision do in fact challenge a land use policy" and "not all one-time decisions are equal"; and denying the City's request for summary judgment on this ground). Notably, just like this case, *Avenue 6E* involved a municipal legislative decision. *Id.* at *7. Thus, the Court finds that Plaintiffs have sufficiently alleged a policy of discrimination.

residents in Georgetown County. (ECF No. 6 ¶¶ 145-152.) Plaintiffs produce statistical evidence demonstrating that Black residents are "nearly eight times as likely as White renter households to receive subsidized housing support in Georgetown County." (*Id.* ¶ 147. *See also id.* ¶ 148-152.) Thus, according to Plaintiffs, but for Defendants' discriminatory denial, Porter's Landing would have been built and would have provided an affordable housing option that would have been disproportionately available to Black renters. (*Id.* ¶ 162. *See also id.* ¶¶ 149-152 (alleging based on more than one type of data sample that, if constructed, a much higher share of the occupants of Porter's Landing would be Black).) Additionally, NAACP Plaintiffs allege that many of its members are income-eligible or receive housing choice vouchers and thus, would have sought to move into the new housing units at Porter's Landing. (*Id.* ¶ 163.) Accordingly, they contend that Defendants' denial of the zoning application has harmed its members by exacerbating the housing insecurity faced by its members. (*Id.* ¶¶ 146, 162-166.)

Accepting as true both the statistics set forth in the amended complaint and the allegations plausibly alleging discriminatory intent,[5] the Court finds that Plaintiffs have adequately averred a causal connection between Defendants' zoning practice and Plaintiffs' asserted injuries. Therefore, the Court holds that Plaintiffs have carried their step one burden and survived Defendants' motion to dismiss stage as to this claim.

### 4. Perpetuation of Segregation

"Perpetuation of segregation is, in effect, an alternate avenue of pleading disparate impact under the FHA." *Nat'l Fair Hous. All. v. Bank of Am., N.A.*, 401 F. Supp. 3d 619, 641 (D. Md. 2019). If a policy or practice "perpetuates segregation and thereby prevents

---

[5] "Evidence of discriminatory intent can bolster a disparate impact case." *Ave. 6E Invs., LLC v. City of Yuma, Arizona,* 217 F. Supp. 3d 1040, 1055 (D. Ariz. 2017)

interracial association, it will be considered invidious under the Fair Housing Act notwithstanding the fact that it may have no immediate impact." *Id.* (citing *Betsey v.Turtle Creek Assocs.*, 736 F.2d 983, 987 n.3 (4th Cir. 1984)).

Consistent with the case law since the 1970s, the United States Department of Housing and Urban Development in 2013 formally codified segregative-effect claims in which a policy or practice may have a discriminatory effect and "harm the community generally by creating, increasing, reinforcing, or perpetuating segregated housing patterns." *See* Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11460-61, 11468-69 (Feb. 15, 2013) (promulgating 24 C.F.R. § 100.500(a)) (the "2013 HUD Regulation") (noting that "the perpetuation of segregation theory of liability has been utilized by private developers and others to challenge practices that frustrated affordable housing development in nearly all-white communities and thus has aided attempts to promote integration [citing cases]").

The 2013 HUD Regulation incorporated the burden-shifting analysis applied by the circuit courts considering FHA discriminatory-effect cases, including segregative-effect cases in which municipalities were accused of using their land-use powers to block non-profit integrated housing developments in certain neighborhoods, towns, and villages that were virtually all-white. *See, e.g., Huntington*, 844 F.2d at 937-41 (holding that New York City suburban town violated the FHA by refusing to rezone neighborhood which was 98% white for subsidized housing project, confining project to largely minority urban renewal area); *U.S. v. City of Black Jack*, 508 F.2d 1179, 1188 (8th Cir. 1974) (holding that adoption of zoning ordinance prohibiting construction of affordable housing townhouses in 99% white suburban city outside St. Louis, which was 41% black, violated FHA); *Dews*

*v. Town of Sunnyvale*, 109 F. Supp. 2d 526, 567-68 (N.D. Tex. 2000) (holding that ban on apartments and less costly single-family housing by small town, 97% white, in Dallas suburbs (2,228 residents) "perpetuates segregation"); *cf. Avenue 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 494-96 (9th Cir. 2016) (affirming summary judgment on segregative-effect claim brought by developer of predominately Hispanic development to be built near a "white-majority area" where Hispanics constituted 55% of population and the white population had fallen from 75% to at most 65%, which showed that Hispanics were integrating into the area).

As discussed above, Plaintiffs have alleged, using statistical evidence, that Defendants' denial of the zoning application prevented racial integration that the affordable rental units at Porter's Landing would have provided. (*See* ECF No. 6. ¶¶ 153-157.) Indeed, Plaintiffs have plausibly shown that those most affected by Defendants' allegedly discriminatory conduct in this case are residents of Georgetown County who depend on affordable housing, which Plaintiffs have shown are predominantly Black residents. (*Id.*) Because the Court finds that Plaintiffs' allegations meet the *Twombly/Iqbal* standard, the Court denies Defendants' motion to dismiss Plaintiffs' perpetuation of segregation claim under the FHA.

### B. Constitutional Claims

#### 1. 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteen Amendment

In addition to their FHA claims, Plaintiffs allege that Defendants' racially motivated denial of the zoning application deprived them of their right of equal access to housing in violation of § 1983 and the Equal Protection Clause of the Fourteenth Amendment. (ECF No. 6 ¶¶ 206-212.)

According to Defendants, however, Plaintiffs have not adequately stated, with any specificity, an official policy or custom of discrimination, and the County is thus immune from this action under § 1983 pursuant to *Monell v. Dep't of Soc. Svcs. of City of New York*, 436 U.S. 658, 690 (1978) (ECF No. 14 at 12- 13.)[6]

Under 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g., Nieves v. Bartlett*, — U.S. —, 139 S. Ct. 1715, 1721 (2019); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey*, Ltd., 526 U.S. 687, 707 (1999).

---

[6] The Court has already found that Plaintiffs have sufficiently alleged an official policy of discrimination. *See supra* note 7. *See also Ave. 6E*, 2018 WL 582314, at *6 (stating that "[t]he court's conclusion that zoning decisions inherently set policy is supported by municipal liability cases in the § 1983 context" (relying on *Monell*); "[e]ven a single decision is enough to impose [§ 1983] liability 'whether or not that body has taken similar action in the past or intended to do so in the future—because even a single decision by [a legislative] body constitutes an act of official government policy'" (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986))); *MHANY Mgmt. Inc. v. Inc. Vill. of Garden City*, 985 F. Supp. 2d 390, 428 (E.D.N.Y. 2013) (holding that "the enactment of a zoning ordinance" is sufficient under *Monell* with respect to plaintiff's § 1983 action against a municipality), *aff'd sub nom. Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581 (2d Cir. 2016).

To prevail on a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019). Here, the right allegedly violated arises under the Fourteenth Amendment. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982) (holding that "it is clear that in a § 1983 action brought against a state official, the statutory requirement of action "under color of state law" and the "state action" requirement of the Fourteenth Amendment are identical"). To recover under the Fourteenth Amendment's Equal Protection Clause, a plaintiff must present proof of discriminatory intent on the part of the defendants. *See Arlington Heights*, 429 U.S. at 252.

Municipalities[7] are liable as "persons" under 42 U.S.C. § 1983 for constitutional torts caused by the municipality. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). A municipality cannot be held responsible for the conduct of its officers on a theory of *respondeat superior*, *Monell*, 436 U.S. at 691-95, and "[i]t is only when the execution of the government's policy or custom inflicts the injury that the municipality may be held liable under § 1983." *City of Canton*, 489 U.S. at 385 (internal modifications and quotations omitted).

As the Fourth Circuit has explained:

[a] municipality is not subject to section 1983 liability simply because a claimant is able to identify conduct attributable to the municipality. Rather, "[t]he plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).

---

[7] "A municipality is merely a political subdivision of the State from which its authority derives." *United Bldg. & Const. Trades Council of Camden Cnty. & Vicinity v. Mayor & Council of City of Camden*, 465 U.S. 208, 215 (1984).

> Accordingly, to impose section 1983 liability on a municipality, a claimant must first show that "a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* at 411. If a section 1983 claimant can demonstrate the requisite degree of culpability, she must then show "a direct causal link between the municipal action and the deprivation of federal rights." *Id.* at 404.

*Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 524 (4th Cir. 2000) (alterations and emphasis in original).

As discussed *supra*, Plaintiffs have plausibly alleged that Defendants acted with discriminatory intent when they denied the zoning application, and Plaintiffs have sufficiently averred an actionable causal connection between Defendants' zoning practice and their asserted injuries. Consequently, Georgetown County is not immune under § 1983 pursuant to *Monell,* and the Court denies Defendants' motion to dismiss Georgetown County on immunity grounds.

### 2.  42 U.S.C. §§ 1981 and 1982

Next, Plaintiffs' fifth and sixth claims for relief against Defendants are brought under §§ 1981 and 1982. (ECF No. 6 ¶¶ 213-217.) Section 1981 provides that "all persons within the jurisdiction of the United States shall have the same right in every state . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. Section 1982 provides that all persons shall have the same right enjoyed by white citizens specifically with respect to real and personal property. See 42 U.S.C. § 1982.

Defendants move to dismiss these claims based on *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989). (ECF No. 12-1 at 21.) In *Jett*, the Supreme Court stated:

> We hold that the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the

31

Constitution and laws,' provides for the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor.

*Jett*, 491 U.S. at 735. Thus, according to Defendants, because §§ 1981 and 1982 do not provide a private right of action for nongovernmental actors, no relief can be granted to Plaintiffs for claims under these sections and they should be dismissed. (ECF No.14 at 12.)

In response,[8] Plaintiffs argue that *Jett* does not demand dismissal of these claims, relying on the Fourth Circuit's ruling in *Dennis v. County of Fairfax*, 55 F.3d 151 (4th Cir. 1995). (ECF No. 13 at 28.) According to Plaintiffs, the Fourth Circuit held in *Dennis* that "claims pled under 42 U.S.C. § 1981 may run afoul of the Court's ruling in *Jett if the 42 U.S.C. § 1981 claims do not satisfy the 42 U.S.C. § 1983 requirement that plaintiffs allege an official policy or custom of discrimination*." (*Id.* at 28-29 (emphasis added).) Here, Plaintiffs contend that, unlike the plaintiffs in *Dennis*, "they have successfully pled their claims related to 42 U.S.C. § 1983" and, therefore, dismissal is not warranted. (*Id.* at 29.) The Court agrees.[9]

As excerpted above, *Jett* held that § 1983 provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed

---

[8] Plaintiffs also argue that two years after *Jett*, Congress amended 42 U.S.C. § 1981 to provide for a private right of action against state entities. (ECF No. 13 at 28.) Plaintiffs rely on *Federation of African American Contractors v. City of Oakland*,[8] wherein the Ninth Circuit held that the amendment created an implied cause of action for private individuals against state entities. (*Id.*) Notably, however, not long after the filing of Plaintiffs' response, the Ninth Circuit overruled *Federation* and joined the majority of circuit courts that have uniformly held that *Jett* remains good law. *See Yoshikawa v. Seguirirant*, 74 F. 4th 1042, 1047 (2023) (instructing the district court to allow plaintiff to replead his § 1981 claim against defendant as a § 1983 claim). Thus, the Court need not address this argument further.

[9] The Court notes that Defendants do not address *Dennis* in their reply so it is unclear if they dispute that the "official custom or policy" requirement applies to Plaintiffs' § 1981 claim. Nonetheless, Defendants contend that Plaintiffs have failed to make such allegations regarding their § 1983 claim, such that dismissal of Plaintiffs' § 1981 claim would still be warranted, according to Defendants, even if the Court accepts Plaintiffs' argument. (*See* ECF No. 14 at 12.)

against a state actor. 491 U.S. at 735. Consequently, as instructed by the Fourth Circuit, "the § 1983 requirement that plaintiffs show an official policy or custom of discrimination also controls" when plaintiffs allege municipal actors violated their rights under § 1981. *Dennis*, 55 F.3d at 156 (*citing* Jett, 491 U.S. at 735-36); *see also Lewis v. Robenson Cnty.*, 63 F. App'x 134, 138 (4th Cir. 2003) (finding plaintiff's § 1981 claim fails because plaintiff "has not shown an official policy or custom of discrimination"); *Farmer v. Ramsay*, 43 F. App'x 547, 553 n.8 (4th Cir. 2002) (observing that a plaintiff suing a state or municipal actor "has no cause of action based on § 1981 independent of § 1983"). Accordingly, because Plaintiffs have sufficiently alleged an official policy of discrimination, the Court finds that Plaintiffs §§ 1981 and 1982[10] claims survive the motion-to-dismiss stage under the Fourth Circuit's holding in *Dennis*. Moreover, the Court notes that dismissal at this stage is further inappropriate because, as concluded above, Plaintiffs have sufficiently alleged that Defendants' conduct in denying the zoning application was a result of discriminatory intent by Defendants and deprived them of their rights protected by these statutes. *See Gen. Bldg. Contractors Ass'n, Inc. v. Penn*., 458 U.S. 375, 391 (1982) (stating that § 1981 can only be violated by purposeful discrimination); *White v. City of Annapolis*, 439 F. Supp. 3d 522, 541-42 (D. Md. 2020) (stating a claim under § 1982 requires "discriminatory intent on the part of the defendant").

---

[10] While *Jett* did not address whether § 1983 is also the exclusive federal damages remedy for § 1982 claims brought against state actors, the Court holds that the same rationale applies for § 1982 claims brought against state actors. *See, e.g., Victors v. Kronmiller*, 553 F. Supp. 2d 533, 543 (D. Md. 2008) (noting that "§ 1983 serves equally well as a remedy for the violation of Plaintiffs' rights . . . under § 1981 and . . . under § 1982" but not addressing the impact of *Dennis* on these claims).

## <u>CONCLUSION</u>

Based on the foregoing, the Court finds Plaintiffs' amended complaint sufficient to withstand Defendants' motion filed pursuant to Rules 8, 12(b)(1), and 12(b)(6) of the Federal Rules of Civil Procedure.   Accordingly, the Court hereby **denies** Defendants' motion to dismiss (ECF No. 12).

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

September 28, 2023
Charleston, South Carolina