# Exhibit B



# Transcript of Steven Shaw

**Date:** October 21, 2024
**Case:** South Carolina State Conference, et al. -v- Georgetown County, et al.

**Planet Depos**
**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com
**www.planetdepos.com**
Michigan #8598 | Nevada #089F | New Mexico #566

1   column marked market area lower than those under

2   the column marked county, the same or are they

3   higher?

4       A.    Market area is lower than the county.

5       Q.    Would those numbers being lower be

6   consistent with the possibility that the

7   market -- primary market area used in this market

8   analysis includes part of but not all of

9   Georgetown County?

10      A.    Those numbers would indicate that.  But

11  again, I -- I have not -- I'm not privy to the

12  information and the data he used.  But if you

13  look at the numbers, it would appear that it

14  does -- it's not the full county.

15           MR. SILVERSTEIN:  I would like to mark

16  the document entitled Preliminary Expert Report

17  Market Study PMA Porter's Landing 6/20/24 as

18  Exhibit 2.  I will pull that up on my screen.

19           (Whereupon, Shaw Deposition Exhibit 2

20  was marked for identification and attached to the

21  transcript.)

22      Q.    Are you able to see the document?

23      A.    Yes.

24      Q.    Is this document familiar to you?

25      A.    Yes.

1      Q.    And what is it?

2      A.    That is the report that I prepared.

3      Q.    I'm going to stop sharing for just a

4   moment and move to a particular point in the

5   document and then pull it back up.

6            Do you recognize this map?

7      A.    Yes.

8      Q.    And what does this map depict?

9      A.    This is what I determined the market

10  area to be for the Porter's Landing site.

11     Q.    And with respect to the inclusion of

12  census tract 9201 in the primary market area,

13  what was the basis of your decision to include

14  census tract 9201 in the primary market area?

15     A.    It would -- my -- my thought for that

16  area would be the people living in that census

17  tract, if they required rental housing, where

18  would they be more apt to move, and is there

19  adequate roadway infrastructure that would

20  connect them to the site in a convenient manner,

21  and that census tract met those criteria.

22     Q.    Did you look at the average or typical

23  driving time between locations within that census

24  tract and the proposed site?

25     A.    Yes.  I apologize.  Yes, I do look at

1      Q.    And I will go back down again.  So that

2   dot reflects, as you said, that reflects sort of

3   the middle point of that census tract, census

4   tract 9205.02?

5      A.    Approximately.

6      Q.    Approximately.  Was census tract 9205.02

7   included in the primary market area defined by

8   John Wall and Associates for their market

9   analysis that they conducted for Porter's

10  Landing?

11     A.    Again, my -- my report didn't look at

12  his.  I mean, I would have to go back and look at

13  his report.  I can tell you what I think but that

14  is no good.

15     Q.    Based on the portions of his report that

16  we reviewed about say 20 minutes ago, was this

17  census tract included in the documents that I

18  showed you as being the primary market area?

19     A.    I don't believe it was.

20     Q.    Why did you select census tract 9205.02

21  as the census tract to use for showing driving

22  distance to Myrtle Beach?

23     A.    Because if you look at the income make-

24  up based on the shades, I mean, those -- there

25  are more -- the median income of those block

1    groups are somewhat similar to those in

2    Georgetown, but my -- but my feeling was they

3    would be more drawn to Myrtle Beach than going to

4    Georgetown.

5         Q.    If we -- if we assume that the market

6    analysis conducted by for -- the market study

7    conducted by John Wall and Associates did not

8    include census tract 9205.02 in the primary

9    market area, would it be fair to say that that

10   determination in that market analysis that

11   9205.02 is not part of the primary market area is

12   consistent with your reasoning here?

13        A.    I -- I can't tell you his methodology

14   and his -- how he goes about selecting his market

15   area.  So I can't answer that question.

16        Q.    Are your approaches consistent in terms

17   of primary market area with regard to whether

18   9205.02 should be included?

19        A.    Again, I don't know his approach.  I

20   don't know what he looks at and what he

21   prioritizes in his analysis.

22        Q.    Did both you and John Wall and

23   Associates omit census tract 9205.02 from the

24   primary market area?

25        A.    I believe so.

1    But other than, you know, where I submit it, I

2    provide it to the developer, it's pretty much

3    that's where my involvement ends with the state.

4           The state does review it and if there's

5    any questions or any issues, they will generally

6    contact the analyst.  But I -- I have never had

7    any issues as long as I can remember.

8       Q.    Do you have any knowledge as to whether

9    it's staff of SC Housing that review the

10   submissions or whether it's a third party?

11      A.    I -- I don't know.  I guess I can't

12   answer the question now, because it has been both

13   in the past.  It has been third party in the

14   past.  It has been in house in the past.  The

15   most recent, I can't tell you.

16      Q.    Do you have any knowledge regarding what

17   steps SC Housing take if they or if a third party

18   that they have contracted with determines that

19   there is a flaw or deficiency in a -- in a market

20   study?

21      A.    I've got no firsthand knowledge.  It's

22   never happened to me.  So I -- I do not, no.

23      Q.    Do you have any knowledge to the effect

24   that applicants can or cannot revise a submitted

25   market study based on feedback from SC Housing or

1  tax credit, something in the middle with rural

2  development.  And I can't tell you the breakdown

3  with family and senior, you know.  That was not a

4  focus of my report.

5      Q.    Are you familiar with the scoring

6  criteria that SC Housing uses to determine to

7  which applicants to award nine percent low-income

8  housing tax credit?

9      A.    Just in a general way.  I'm not involved

10 in that.  That does not impact my assessment or

11 anything.  So as far as the scoring, it does not

12 impact me.

13     Q.    So you do not have any opinion that you

14 are expressing in this case about whether based

15 on those scoring criteria, Porter's Landing would

16 or would not be likely to receive tax credits?

17     A.    Based on my expert report, it was not

18 part of that.

19          MR. SILVERSTEIN:  Could we take a

20 ten-minute break?

21          MR. NICHOLSON:  Sure.

22          MR. SILVERSTEIN:  Thanks.

23          (Thereupon, there was a recess taken at

24 1:10 p.m.)

25          (Thereupon, the proceedings were resumed

1    County, do there appear to be -- how many

2    low-income housing tax credits -- low-income

3    housing tax credit developments appear to be

4    closer to those areas where my cursor is right

5    now that are within Horry County and in

6    comparison to Porter's Landing?

7          I'm sorry.  I will rephrase the

8    question.  How many low-income tax credit

9    developments in Horry County, according to this

10   map, appear to be closer to the southern portions

11   of the Waccamaw Neck or the coastal area of

12   Georgetown County in comparison to Porter's

13   Landing?

14      A.    I don't know if I still understand your

15   question.  Where you are pointing, there is

16   nothing there according to this data and this

17   map.  But I have no way to verify if it's

18   accurate or anything like that.

19      Q.    But if we assume the accuracy of the

20   map, do there appear to be any low-income housing

21   tax credit developments in Horry County that are

22   closer to where my cursor is than Porter's

23   Landing?

24      A.    It does not appear, no.

25      Q.    Okay.  If one were to go further north

1  portion of Georgetown County, so those residents,

2  who are also low income, do you have an opinion

3  as to whether they would be more likely to seek

4  out affordable housing in Conway than they would

5  at the Porter's Landing site?

6     A.    No.  I've got no opinion either way.  I

7  mean, there are different factors that people

8  have to move, you know, if they have got family

9  in town.  So for me to say they are more apt to

10  move to Conway over Georgetown or vice versa, I

11  can't do it.  You can't do it.  So . . .

12     Q.    In your report, you describe the bridge

13  between the inland portions of Georgetown County

14  near the city of Georgetown and the Waccamaw Neck

15  as being a significant physical barrier.  Is that

16  correct?

17     A.    The bridge is not a physical barrier but

18  the waterway is.

19     Q.    The waterway is a significant physical

20  barrier?

21     A.    Right.

22     Q.    Is -- and is the reason why it's a

23  significant physical barrier, you know, something

24  to do with the water sort of inherently itself or

25  is it just that it takes a long time to get

1  around driving?

2      A.    Multiple factors.  One is the

3  convenience to traverse the market area.  To get

4  to where the goods and the services are located,

5  there is really only one way if you are in the

6  coastal area, you know.  So if there's any issues

7  with that, you know, construction, the bridge

8  going out, you know, there -- it just makes it

9  difficult.

10         And just with commuting within the

11  market area, you want to make sure that there is

12  an easy commute from the property to areas, you

13  know, where the residents potentially could come

14  from, and that's the barrier in this case.

15     Q.    Would you not consider there to be a

16  significant physical barrier between a location

17  and another location if there was simply a large

18  land area in between, i.e., if it were many miles

19  away but over land rather than water?

20     A.    It depends on the situation, the

21  scenario and what that land barrier is.  If it's

22  mountains, that is a land area that would be

23  similar to a waterway, if there is only one way

24  in and one way out, and if there are issues with

25  that road, you know, where it impacts commutes,

1    then just feasibility to get around the market

2    area.

3          But if it's a, you know, if there are

4    state highways, it wouldn't have much.   I mean

5    it all depends on the situation and the

6    configuration of the -- of the land, I guess.

7     Q.    In including census tract 9201 in your

8    primary market area, did you evaluate the

9    viability of different highway routes or roads

10   out to the Porter's Landing site?

11    A.    Yes.  Yes.  I mean, there is a direct

12   route and there's, you know, multiple routes as

13   well.

14    Q.    Did you assess how much extra time using

15   one of the secondary routes would add to a trip?

16    A.    No, I did not.

17          MR. SILVERSTEIN:  I'm going to mark as

18   Exhibit 6 the spreadsheet that I most recently

19   uploaded to the portal.  It's the -- I believe

20   it's the only file with the file name of this

21   nature, but it's a bear of a file name.  It's

22   ACSDT5Y2019.E109001-2024-10-21T172350.  So I will

23   pull that up.

24          (Whereupon, Shaw Deposition Exhibit 6

25   was marked for identification and attached to the

1    table name?  This is in the very first cell at

2    the top.

3       A.    Household income in the past 12 months

4    in 2019 inflation-adjusted dollars.

5       Q.    What does the data on this worksheet

6    appear to be illustrating?

7       A.    Income distribution for census tract

8    9205.04.

9       Q.    And is census tract 9205.04, is that one

10   of the census tracts that was on the Waccamaw

11   Neck and is included in the market study done by

12   John Wall and Associates but not included in the

13   primary area for your market analysis?

14      A.    I can tell you it's not in my market

15   area.  I can't -- I don't have the census tracts

16   memorized that John Wall used.

17      Q.    Do you recall how many units were

18   anticipated to be in the Porter's Landing

19   development?

20      A.    Geez, I do not know off the top of my

21   head.  I'm working on so many projects right now.

22   So . . .

23      Q.    Totally understand.  We can switch.

24   Hold on a second.  We are looking at your report

25   again.  Is that correct?

1     Q.    Based on your familiarity with the John

2   Wall and Associates market study, do you have any

3   opinion about whether it reflects a gerrymandered

4   market area?

5     A.    Again, I -- I didn't spend any time

6   analyzing his market area.  So I've got no

7   opinion on that.

8     Q.    Do you have any experience conducting

9   disparate impact analyses?

10     A.    No.

11     Q.    Do you purport to have conducted a

12   disparate impact analysis in this case?

13     A.    No.

14          MR. SILVERSTEIN:  I have no further

15   questions.

16          MR. NICHOLSON:  No questions here.  We

17   will read and sign.

18          THE REPORTER:  Could I get transcript

19   orders please, counsel?

20          MR. NICHOLSON:  Electric for me, please.

21          MR. SILVERSTEIN:  Same here.

22          AV TECH ALEXANDER:  Would you like the

23   exhibits attached to those transcripts?

24          MR. NICHOLSON:  I do.

25          MR. SILVERSTEIN:  Yes.

1          CERTIFICATE OF SHORTHAND REPORTER

2                 NOTARY PUBLIC

3          I, Dianna C. Kilgalen, the officer

4    before whom the foregoing deposition was taken,

5    do hereby certify that the foregoing transcript

6    is a true and correct record of the testimony

7    given; that said testimony was taken by me

8    stenographically and thereafter reduced to

9    typewriting under my direction; that reading and

10   signing was requested; and that I am neither

11   counsel for, related to, nor employed by any of

12   the parties to this case and have no interest,

13   financial or otherwise, in its outcome.

14          IN WITNESS WHEREOF, I have hereunto set

15   my hand and affixed my notarial seal this 31st

16   day of October, 2024.

17

18          My commission expires June 28th, 2025.

19

20          _Dianna C. Kilgalen_

21   _____

22   NOTARY PUBLIC

23   IN AND FOR THE STATE OF MARYLAND

24   COUNTY OF HARFORD

25