# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| **South Carolina State Conference and Georgetown County Branch of the National Association for the Advancement of Colored People, FourSix Development, LLC,** and **We Do Good Work, LLC**<br><br>                      Plaintiffs,<br><br>vs.<br><br>**Georgetown County**, a political subdivision of the State of South Carolina, and the members of the **Georgetown County Council** in their official capacities,<br><br>                      Defendants. | Civil Action No. 2:22-cv-04077-BHH<br><br><br><br><br><br>**SUPPLEMENTAL EXPERT REPORT OF REBECCA TIPPETT** |

I.    **Previous Experience as an Expert Witness**

    1.    My name is Rebecca Tippett. A copy of my *curriculum vitae* accompanies this report as Exhibit 1.

    2.    I am the Principal of Data Distilled, LLC, a demographic consulting firm. I am also the Chief Accountability Officer at the Virginia Early Childhood Foundation where I manage the utilization and governance of data across the organization.

    3.    I have an M.A. and Ph.D. in Sociology from Duke University. I specialized in social stratification and demography and my research was funded by the National Institutes of Aging. From 2010 to 2013, I served as a Research Associate at the Weldon Cooper Center for Public Service at the University of Virginia where I developed and implemented statistical methods to produce county population estimates and state and county population projections and used federal and state data sources to highlight demographic and social trends in Virginia. I also worked with the Census Bureau as a member of the Federal-State Cooperative for Population Estimates and the Federal-State Cooperative for Population Projections. From 2013 to 2022, I was the Founding Director of Carolina Demography, an applied demographic research service at the University of North Carolina at Chapel Hill, where I managed the translation of Census Bureau and other data sources into understandable and actionable information for clients, including local governmental agencies, nonprofits, and businesses.

1

## II. Previous Experience as an Expert Witness

4. I have provided expert witness research and reporting in *United States of America and Walker River Paiute Tribe v. Walker River Irrigation District, et al.*, CV 73-0127 RCJ (D. Nev); *Tahsia Kennedy, et al. v. Monroe Group, Ltd. et al.*, 6:21-cv-01168-DCC (D.S.C.); *Equal Rights Center v. The Lenkin Company Management, Inc. et al.*, No. 2017 CA 002547 B (Sup. Ct. D.C.); *Dwayne Treece et al. v. Perrier Condominium Owners Association, Inc.* (United States District Court for the District of Louisiana, 2:17-cv-10153-SM-DEK (E.D. La.); *State of Washington v. City of Sunnyside, et al.*, No. 20-2-00411-39 (Yakima Co. Sup. Ct.); and *Fair Housing v. Erie Investments*, 2:20-cv-10491 (E.D. Mich.).

## III. Scope of this Report

5. This report assesses whether the decision to not approve the proposed Low-Income Housing Tax Credit (LIHTC) development in Georgetown County (described more fully in Section 18):

   - disproportionately and significantly reduces the housing options and opportunities for Black households relative to White households in Georgetown County.[1]
   - perpetuates segregation in Georgetown County.

## IV. Documents and Information Reviewed/Relied on in Preparation of this Report

6. Summary of Pertinent Data Reviewed

   - To examine the first issue, I use data from the U.S. Census Bureau's American Community Survey on the racial and ethnic composition of renter households by family income and family size, and U.S. Department of Housing and Urban Development data on the characteristics of subsidized households.
   - To examine the second issue, I use data from the 2020 decennial census on the racial and ethnic composition of census block groups and tracts in Georgetown County

7. Specific Data Utilized for Report

   - Image of proposed location of LIHTC development (received via e-mail from Adam Protheroe on March 4, 2022)
   - Distribution of proposed unit mix (received via e-mail from Adam Protheroe on October 17, 2022)
   - 2015–2019 American Community Survey, Tables S0701, B19101B, B19101H, S1903, S2502, B25003B, B25003H. https://data.census.gov

---

[1] Throughout this report, the term Black refers to non-Hispanic Black or African-American and the term White refers to non-Hispanic White.

- County-to-County IRS Migration Profile, Missouri Census Data Center, https://mcdc.missouri.edu/cgi-bin/broker?_PROGRAM=apps.county-migration-picker.sas&st=45
- 2020 Decennial Census, Table P2. https://data.census.gov
- U.S. Department of Housing and Urban Development, 2021 Multifamily Tax Subsidy Income Limits, https://www.huduser.gov/portal/datasets/mtsp.html#2021_query
- 2015–2019 American Community Survey Microdata accessed March 20, 2022 from IPUMS-USA, University of Minnesota, https://ipums.org[2] (revised data accessed on July 15, 2024, to address data coding error reported by IPUMS)

## V. Findings of this Report

8. Finding 1: Based on this evaluation, I find that the decision to not approve the proposed LIHTC development had a significant and disproportionate impact on the affordable housing opportunities for Black households relative to White households.

9. On the first issue of whether the decision to not approve the proposed LIHTC development in Georgetown County disproportionately and significantly reduces the housing options and opportunities for Black households relative to White households, I find that within Georgetown County, Black households are more likely to be renter households than White households; Black renter households are more likely to be receiving housing subsidies than White renter households; and Black renter households are more likely to have incomes that qualify them to live in the proposed LIHTC development (below 50% area median income (AMI)) than White renter households. Based on this evaluation, I find that the decision to not approve the proposed LIHTC development had a significant and disproportionate impact on the affordable housing opportunities for Black households relative to White households.

10. Finding 2: Based on this evaluation, I find that the decision to not approve the proposed LIHTC development perpetuates segregation in Georgetown County.

11. On the second issue of whether the decision to not approve the proposed LIHTC development perpetuates segregation in Georgetown County, I find that within Georgetown County, there are significant levels of segregation: the majority of White (or Black) residents would need to move to different block groups for each block group to have the same racial/ethnic composition as the county overall. The census block group where the proposed development would have been built was disproportionately White relative to the county overall, and the occupants of the proposed development would have been disproportionately Black. If this proposed development were built and occupied, the racial composition of the block group

---

[2] Steven Ruggles, Sarah Flood, Sophia Foster, Ronald Goeken, Jose Pacas, Megan Schouweiler and Matthew Sobek. IPUMS USA: Version 11.0 [dataset]. Minneapolis, MN: IPUMS, 2021. https://doi.org/10.18128/D010.V11.0

residents would be more like the county overall than it currently is. Based on this evaluation, I find that the decision to not approve the proposed LIHTC development perpetuates segregation in Georgetown County.

**VI. Context**

12. Georgetown is a city in central Georgetown County, South Carolina, located on Winyah Bay. Georgetown County is a coastal county that is identified by the Office of Management and Budget as the Georgetown Micropolitan Statistical Area.[3] Micropolitan Statistical Areas are counties or clusters of counties centered on an urban area with a population of at least 10,000 but fewer than 50,000 residents. They represent areas that are a population and economic center for a larger area. Georgetown County is the only county within the Georgetown Micropolitan Statistical Area.

13. The proposed Low-Income Housing Tax Credit (LIHTC)[4] development is in a plot that is bordered on the north by Wedgefield Road and is northeast of Weehaw Plantation Drive. Figure 1 shows the proposed location of the LIHTC development. This plot is north of the city of Georgetown and outside of city limits. The plot is located in census tract 9203.02, block group 2.[5]

---

[3] March 2020 delineation file for core based statistical areas (CBSAs), metropolitan divisions, and combined statistical areas (CSAs). https://www.census.gov/geographies/reference-files/time-series/demo/metro-micro/delineation-files.html Georgetown County is also part of the Myrtle Beach-Conway, SC-NC combined statistical area consisting of Georgetown and Horry counties in South Carolina and Brunswick County in North Carolina. The counties that make up metropolitan or micropolitan statistical areas, their "delineation," are determined by applying the Census Bureau's standards for defining these areas to population and commuting data. Standards are reviewed and revised once a decade, and the areas are generally redrawn once a decade following the most recent decennial census. Between revisions, the Census Bureau reviews population data and will identify changes in metropolitan and micropolitan definitions based on population changes.

[4] According to the U.S. Department of Housing and Urban Development, the LIHTC program "is the most important resource for creating affordable housing in the United States today." It was created by the Tax Reform Act, and "gives State and local LIHTC-allocating agencies the equivalent of approximately $9 billion in annual budget authority to issue tax credits for the acquisition, rehabilitation, or new construction of rental housing targeted to lower-income households." https://www.huduser.gov/portal/datasets/lihtc.html

[5] The United States Census Bureau reports data within various political and statistical geographic units. Political units include counties, municipalities, legislative districts, and voting districts. These geographies reflect government functions and vary significantly in size across states. Statistical geographies are units defined by the Census Bureau to meet specific criteria associated with data quality, such as providing reliable estimates. Statistical geographies are nested within each other: states contain counties; counties contain census tracts; census tracts contain block groups; and block groups contain blocks. Census tracts have approximately 4,000 residents per tract, ranging from about 1,000 to 8,000 residents; the physical size of census tracts depends on how densely populated the region is. Block groups are a statistical division of census tracts and generally range between 600 and a few thousand people. The census tract or census block group are the smallest geographies for which the Census Bureau releases detailed tabulations of demographic, social, and economic information on American households and individuals. https://www.census.gov/programs-surveys/geography/about/glossary.html

4

**Figure 1. Proposed location of LIHTC development (solid lines)**



## VII. Definition of Housing Market

14. How we define the housing market determines how to generate data on the residential patterns that are the subject of the analysis. However, no standard approach to defining a local housing market exists.[6] In this analysis, I use local migration statistics and economic ties (metropolitan definitions) to define the local housing market. This is a reliable method for defining a local housing market.

15. According to the 2015–2019 5-Year American Community Survey (ACS),[7] in any given year during that five-year period, an average of 11.3% of Georgetown County

---

[6] See Schwemm, Robert G. and Calvin Bradford, *Proving Disparate Impact in Fair Housing Cases After* Inclusive Communities, 19 N.Y.U. Journal of Legislative & Public Policy 685 (2016) for an extended discussion of possible ways of identifying local housing markets. When high-quality information on tenants and tenant applications is available, this can be used to define a housing market. This is frequently not available, however, and in these cases the housing market is generally defined by using statistics available for the geographic area around the project. The types of statistics used will vary based on availability. For example, Schwemm and Bradford note that, in setting fair market rents, the Department of Housing and Urban Development "has historically defined market areas geographically by using metropolitan areas and nonmetropolitan counties, but has recently determined that it may be more appropriate, in some circumstances, to use smaller areas (e.g., ZIP codes)" (701).

[7] The American Community Survey is an ongoing statistical survey by the U.S. Census Bureau that gathers information from respondents on topics like ancestry, educational attainment, income, language proficiency, migration, disability, employment, and housing characteristics. It is the only annually updated data source that provides economic and demographic information for all communities. For communities smaller than 65,000 residents, the Census Bureau releases 5-year estimates; combining data from the most recent five years creates more reliable estimates for small geographies.

residents had moved in the past year.[8] This means that about one in every nine Georgetown County residents changed residences within a year. The largest share of movers (4.7% of all residents and 42% of all movers) moved *within* Georgetown County. This data, and Georgetown's status as a micropolitan area, which reflects a high degree of economic and social cohesion within the county,[9] suggests that Georgetown County alone best represents the potential housing market for the proposed development.[10]

16. There were 63,404 residents in Georgetown County in 2020 according to the decennial census.[11] Table 1 shows the racial/ethnic composition of Georgetown's population. The largest population group in Georgetown was White residents (65.0%), followed by Black residents (28.5%), Hispanic residents (3.5%), and residents of all other racial groups (3.1%).[12]

**Table 1. Racial/Ethnic Composition of Georgetown County, 2020**

|  | Total Population | White | Black | Hispanic | All Other Races |
|---|---|---|---|---|---|
| Population Count | 63,404 | 41,186 | 18,051 | 2,225 | 1,942 |
| % of Population |  | 65.0% | 28.5% | 3.5% | 3.1% |

Source: 2020 Decennial Census, Table P2
Note: Hispanic includes individuals of any race; all other race groups are non-Hispanic. All Other Races includes American Indian, Asian, Native Hawaiian/Pacific Islander, other race, and Multiracial.

## VIII. Proposed Affordability Characteristics of Porter's Landing

17. The proposed development contained 90 housing units. The proposed unit bedrooms and income thresholds are shown in Table 2. The units consisted of:

---

[8] Table S0701. Geographic Mobility by Selected Characteristics in the United States, https://data.census.gov/table/ACSST5Y2019.S0701?q=georgetown%20county,%20sc&t=Residential%20Mobility&moe=false.
[9] In descriptions of metropolitan and micropolitan areas, the Census Bureau states: "The general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core." https://www.census.gov/programs-surveys/metro-micro/about.html
[10] The second largest share of movers (3.2% of residents or 28% of all movers) had moved to Georgetown from another county in South Carolina. According to the most recent IRS county-to-county migration files, the largest single flow to Georgetown was from Horry County: between 2018 and 2019, the IRS estimated that 1,701 individuals moved into Georgetown County from another South Carolina County, with 808 or 47.5% coming from Horry County. Applying this share (47.5%) to the 30.5% of movers from another South Carolina County suggests that 13.3% of individuals moving in Georgetown came from Horry County (0.475 * 0.28 = 0.133). This is less than one-third the volume of movers that originated within Georgetown County. IRS county-to-county migration data was accessed at the Missouri Census Data Center (https://mcdc.missouri.edu/cgi-bin/broker?_PROGRAM=apps.county-migration.sas&_DEBUG=&st=45&co=043&yrs=19&yrs=18&yrs=17&minreturns=10)
[11] The decennial census is a 100% count of population and housing as of April 1 of the census year and is available for all geographic groups. The information currently available from the 2020 Census is limited to total population by race and ethnicity and housing unit counts. Evaluations of household tenure (own vs. rent), income, and family size use the 2015–2019 5-Year data from the American Community Survey.
[12] Hispanic includes individuals of any race; all other race groups are non-Hispanic. All Other Races includes American Indian, Asian, Native Hawaiian/Pacific Islander, other race, and Multiracial.

- 12 one-bedroom units (13% of all units)
- 42 two-bedroom units (47% of all units)
- 36 three-bedroom units (40% of all units)

Sixteen of the 90 units (18%) were restricted to families with incomes up to 40% of Area Median Income (AMI); the remaining 74 units (82%) were restricted to families with incomes up to 50% of AMI.

**Table 2. Proposed Unit Distribution**

|  | Number of Units | | | Percent of Units | | |
|---|---|---|---|---|---|---|
| **Bedrooms** | Total | Units at 40% AMI | Units at 50% AMI | Total | Units at 40% AMI | Units at 50% AMI |
| **Total Units** | **90** | **16** | **74** | **100%** | **18%** | **82%** |
| 1 | 12 | 2 | 10 | 13% | 2% | 11% |
| 2 | 42 | 8 | 34 | 47% | 9% | 38% |
| 3 | 36 | 6 | 30 | 40% | 7% | 33% |

18. One-bedroom units serve one- and two-person households while three-bedroom units could accommodate up to six-person households.[13] Based on these potential family sizes and the 2021 HUD Income Limits for Georgetown County (shown in Table 3), the family income qualifications for the proposed units range from $18,080 and $37,450.

**Table 3. 2021 HUD Income Limits for Georgetown County, South Carolina**

| AMI Limit | 1-Person | 2-Person | 3-Person | 4-Person | 5-Person | 6-Person |
|---|---|---|---|---|---|---|
| 40% AMI | $18,080 | $20,640 | $23,240 | $25,800 | $27,880 | $29,960 |
| 50% AMI | $22,600 | $25,800 | $29,050 | $32,250 | $34,850 | $37,450 |

Source: HUD FY 2021 Multifamily Tax Subsidy Project Income Limits
(https://www.huduser.gov/portal/datasets/il/il2021/select_Geography_mtsp.odn)

## IX.    Assessment: Impacts on Housing Opportunities for Black Households

19. To determine if the decision to not approve the development of the proposed LIHTC apartments has a disproportionate and significant effect on Black households relative to White households, I first evaluate the racial composition of the rental market. To do this, I compare the number and percentage of Black households and White households that rent in Georgetown County. Data for this

---

[13] Based on the Keating Memorandum's general guidance on two person per bedroom limits being reasonable occupancy limitations (see *Occupancy Standards Notice of Statement of Policy*, 63 Fed. Reg. 70256–07, 70257 (December 18, 1998). https://www.govinfo.gov/app/details/FR-1998-12-18/98-33568/summary). Alternatively, guidelines on calculating rent issued by HUD use 4- and 5-person family income limits for evaluating the income limits for 3-bedroom units (see #13 in this FAQ: https://www.huduser.gov/portal/datasets/il.html#2021_faq)

evaluation are drawn from the 2015–2019 5-Year American Community Survey (ACS).[14] [15]

20. Following this, I use the ACS data and data from the U.S. Department of Housing and Urban Development (HUD)[16] to compare the composition of subsidized households in Georgetown County to the broader rental market.

21. Finally, I use ACS data to compare Black and White families eligible for LIHTC housing (family incomes below 50% AMI). To do this, I use the Public Use Microdata (PUMS) data from the ACS for the Public Use Microdata Area (PUMA) containing Georgetown, Marion, and Dillon counties to evaluate family income by family size by race and ethnicity among renter households.

*Racial Composition of Renter Households in Georgetown County*

22. There are 25,498 total households in Georgetown County according to the 2015–2019 ACS. Of these, 5,399 or 21.2 percent are renter households. Table 4 shows renter rates in Georgetown by the race of the household head.

23. Among Black households in Georgetown, 29.5 percent are renting compared to 16.0 percent of White households. This is a difference of 13.5 percentage points. When expressed as a ratio, the Black renter rate to White renter rate [29.5%/16.0%] is 1.847, meaning that Black households are nearly twice as likely as White households to be renting.

---

[14] The American Community Survey data is reported in 1-year estimates for geographic areas with populations of 65,000 or more and in 5-year estimates for areas with fewer than 65,000 residents. Because Georgetown County's population is less than 65,000, the 5-year ACS data is the only source of detailed demographic and socioeconomic data for the county. Data from the 2015–2019 5-Year ACS was used because, at the time I conducted this analysis, in October 2022, that was the most current, highest quality data available from the U.S. Census Bureau that was available for both the summary tables and the Public Use Microdata Samples (PUMS). The COVID-19 pandemic significantly impacted the Census Bureau's collection of the 2020 ACS data, and the Bureau encouraged users to use caution when using any data products containing the 2020 ACS data (https://www.census.gov/programs-surveys/acs/technical-documentation/user-notes/2022-04.html). Using the more recently released 2020 or 2021 5-Year ACS data does not change the findings of this report.

[15] Data for tenure (own vs. rent) by race and ethnicity and family income (all households) by race and ethnicity are drawn from the summary tables published on https://data.census.gov. These pre-tabulated tables do not provide information on the intersection of family income, renter status, family size, and race and ethnicity. To evaluate this, I use the Census Bureau's Public Use Microdata Samples (PUMS) from IPUMS-USA (https://ipums.org). The PUMS data contain individual records and allow for more nuanced evaluations. To protect respondent privacy, the microdata is released for geographies known as the Public Use Microdata Area (PUMA). PUMAs contain approximately 100,000 individuals; Georgetown is in PUMA 1000 with Marion and Dillon counties (https://www.census.gov/geographies/reference-maps/2010/geo/2010-pumas/south-carolina.html).

[16] HUD provides detailed information on households receiving housing assistance at https://www.huduser.gov/portal/datasets/asshsg.html#2009-2021_query

**Table 4. Georgetown Rental Rates by Race of Householder**

|  | Black | White |
|---|---|---|
| Total Households | 7,240 | 17,416 |
| Renter Households | 2,136 | 2,782 |
| Rental Rate | 29.5% | 16.0% |
| Black-White Difference |  | 13.5% |
| Disparity Ratio (Black:White) |  | 1.847 |
| Z-Score |  | 5.4340 |

Source: 2015–2019 5-Year American Community Survey, Tables B25003B and B25003H

24. To test for statistically significant differences, I calculate the standard error for the estimates based on the Census Bureau guidance on how to estimate standard error for the ACS data.[17] I then use a Z-test to determine whether there are statistically significant differences between the rental rates of Black and White households. The Z-test for statistically significant differences between the two percentages produces a Z-score; the Z-score indicates the level of significance in standard deviations. To be significant at the 90% level, the Z-score must be 1.645 or higher; to be significant at the 95% level, the Z-score must be 1.96 or higher; and to be significant at the 99% level, the Z-score must be 2.326 or higher. The Z-score in Table 4 is 5.434, well above the 99% level of statistical significance, meaning that these differences are unlikely to have occurred by chance.

25. Within Georgetown County, Black households are much more likely to be renter households and have a greater need for rental housing relative to White households. The failure to approve the proposed LIHTC apartments disproportionately and significantly impacts Black households relative to White households.

*Racial Composition of Subsidized Renter Households in Georgetown County*

26. There are 570 households in Georgetown County receiving subsidized housing according to 2019 HUD data. Of these, 85% (485) are Black and 14% (80) are White.[18] As shown in Table 4, there are 2,136 Black renter households and 2,782 White renter households in Georgetown according to the ACS; these comprise 40% and 52%, respectively, of all 5,399 renter households in Georgetown.

---

[17] U.S. Census Bureau. *Worked Examples for Approximating Standard Errors for ACS Data.* https://www2.census.gov/programs-surveys/acs/tech_docs/accuracy/2018_ACS_Accuracy_Document_Worked_Examples.pdf

[18] The programs included here include Public Housing (282 residents); Housing Choice Vouchers (125 residents); and Project Based Section 8 (163 residents). The share of residents in these programs that identify as Black is 90%, 95%, and 68%, respectively. Two of the four Project Based Section 8 complexes in Georgetown County—St. Elizabeth Place and Millner Elderly Housing, Inc.—are focused on serving the elderly; these complexes were 21% and 63% Black in 2019. Subsidized housing—particularly housing that does not serve the elderly—serves a disproportionately Black population in Georgetown; the proposed development is not senior housing.

27. Black rental households are much more likely than White rental households to receive subsidized housing support in Georgetown County. Table 5 shows the proportion of Black and White renter households receiving subsidized housing in Georgetown County. The percentage of Black households receiving subsidized housing is calculated by dividing the number of HUD subsidized households by the total number of renter households in Georgetown; these figures are: 485/2,136 = 22.7%. For White households, these figures are: 80/2,782 = 2.9%. This is a difference of 19.8 percentage points. This represents a Black-White disparity ratio of 7.896, which indicates that Black rental households are nearly eight times as likely as White rental households to be receiving subsidized housing support in Georgetown County.[19]

**Table 5. Georgetown Subsidized Rental Housing by Race of Householder**

|  | Black | White |
|---|---|---|
| Renter Households | 2,136 | 2,782 |
| HUD Subsidized Households | 485 | 80 |
| % of Subsidized Renters | 22.7% | 2.9% |
| Black-White Difference |  | 19.8% |
| Disparity Ratio (Black:White) |  | 7.896 |

Sources: 2015–2019 5-Year American Community Survey, Tables B25003B and B25003H; 2019 HUD Picture of Subsidized Households

28. Among Georgetown County renter households, Black renter households are much more likely to be receiving housing assistance relative to White renter households, indicating that the failure to approve the proposed LIHTC apartments disproportionately and significantly impacts Black households relative to White households.

*Family Income*

29. Data from the ACS summary tables provide the overall distribution of family income by race and ethnicity; this data is not disaggregated by family size or by household tenure (own vs. rent). To understand this, I use the individual records data released in the Public Use Microdata Series (PUMS) data.[20] To protect respondent privacy, the PUMS files are released at a geography known as the Public Use Microdata Area or PUMA; these geographies contain roughly 100,000 persons.

30. Because Georgetown's population is not large enough to make up a PUMA on its own, Georgetown's data is combined with Marion and Dillon counties in a single

---

[19] Because the HUD picture of subsidized households is directly reported and not based on a sample, there is no standard error with which to calculate a Z-score. For a conservative approach, I assume that the number of HUD subsidized households has the same standard error as the number of renter households reported by the ACS. This comparison yields a Z-score of 1.77; this is statistically significant at the 90% confidence level, indicating that these results are unlikely to be due to chance.

[20] All PUMS data accessed at IPUMS-USA, https://ipums.org.

10

PUMA. About half of all households in the PUMA are within Georgetown County.[21] The income differences between Black and White residents in Georgetown are much larger than in Marion and Dillon counties. According to the 2015–2019 American Community Survey, the median household incomes for White versus Black householders were:

- $62,805 vs. $28,233 in Georgetown (White median income is 222% of Black medians)
- $37,700 versus $26,377 in Dillon (White median income is 143% of Black medians)
- $40,112 versus $27,059 in Marion (White median income is 148% of Black medians)

In Marion and Dillon counties, White households will be more likely to be LIHTC-eligible than in Georgetown County. As a result, the analysis with PUMA data is a conservative estimate of the income differences between these two groups of renters in Georgetown County.[22]

31. The family income qualifications for the proposed units ranges from $18,080 and $37,450, depending on family size, as shown in Table 3 above. Using the PUMS data, I classify families as having incomes below AMI of 40% and AMI of 50% based on their family size and total family incomes.[23] Table 6 shows the percentage of Black and White renter family households in the Georgetown, Marion, and Dillon County PUMA with incomes below 40% and 50% of AMI.[24]

**Table 6. Georgetown, Marion, and Dillon (PUMA 1000) LIHTC-Eligible Family Households by Race of Householder**

| Income Ranges | Black | White | Disparity Ratio | Z-Score |
|---|---|---|---|---|
| Less than 40% of AMI | 57% | 32% | 1.77 | 5.08 |
| Less than 50% of AMI | 67% | 39% | 1.70 | 5.60 |

Source: 2015–2019 5-Year American Community Survey Microdata, IPUMS-USA

32. The PUMS data produces estimates that 57% of Black family renter households and 332% of White family renter households have incomes below 40% of AMI. The Z-score is 5.08, above the value required for a 99% confidence level. The disparity ratio is 1.77, indicating that, after accounting for family size, Black renter

---

[21] According to Table S1903 in the 2015–2019 5-Year ACS, there were 25,498 households in Georgetown, 11,600 in Marion, and 11,029 in Dillon. Combined, this represents 48,127 households; 25,498/48,127 = 53% of the households in the PUMA were in Georgetown County.

[22] The Black-White disparity in renters receiving subsidized housing was also smaller in Dillon and Marion counties compared to Georgetown County.

[23] Family size (FAMSIZE) represents the number of individuals related to the household head by blood, marriage/cohabiting partnership, or adoption. Total family income (FTOTINC) is the total pre-tax money income from all sources earned by the family of the household head in the previous 12 months (all dollar values represent 2019 dollars).

[24] The race of the family was determined by the race of the head of household. All analysis was limited to the heads of household. Standard errors of the proportions used to calculate Z-scores were calculated using the survey replicate weights in Stata using the guidance provided by IPUMS-USA here: https://usa.ipums.org/usa/repwt.shtml

11

households are 1.77 times as likely as White renter households to have family incomes below 40% AMI.

33. Sixty-seven percent of Black family renter households and 39% of White family renter households have incomes below 50% of AMI, the upper limit for the proposed LIHTC development. The Z-score is 5.60, above the value required for a 99% confidence level. The disparity ratio is 1.70, indicating that, after accounting for family size, Black renter households are 1.7 times as likely as White renter households to have family incomes below 50% AMI.

34. Among Georgetown, Marion, and Dillon renter households, Black renter households are much more likely to have family incomes below 50% AMI relative to White renter households, indicating that the failure to approve the proposed LIHTC apartments disproportionately and significantly impacts Black households relative to White households.

*Summary*

35. Within Georgetown County, Black households are much more likely to be renter households than White households; Black renter households are much more likely to be receiving housing subsidies than White renter households; and Black renter households are much more likely to have incomes that qualify them to live in the proposed LIHTC development (below 50% AMI) than White renter households. Based on this evaluation, I find that the decision to not approve the proposed LIHTC development had a significant and disproportionate impact on the affordable housing opportunities for Black households relative to White households.

X.  **Assessment: Perpetuation of Segregation**

36. To determine if the decision to not approve the development of the proposed LIHTC apartments perpetuates segregation in Georgetown County, I first calculate the Index of Dissimilarity (D). This is the most common measure of segregation.[25]

37. The Index of Dissimilarity for two groups, here the Black and White population, is calculated by the following equation:

$$D = \frac{1}{2}\sum_{i=1}^{n}\left|\frac{w_i}{W_T} - \frac{b_i}{B_T}\right|$$

Where:
    n = number of spatial units (block groups or tracts)
    $w_i$ = number of White residents in spatial unit i
    $W_T$ = total number of White residents in the county

---

[25] See, for example, "Measures of Segregation and Isolation" by Benjamin Forest () and "Using the "Index of Dissimilarity" to Measure Residential Racial Segregation" by Steven W. Peuquet (http://www1.udel.edu/uapp800/Lecture%20Material/Index%20of%20Dissimilarity%20Example.htm)

$b_i$ = number of Black residents in spatial unit i
$B_T$ = total number of Black residents in the county

38. The resulting number identifies how many individuals in the group being compared would need to relocate to obtain a uniform distribution of the population by race across the county. The value of D can range from 0—when all spatial units within the county have the same proportion of Black and White residents as the county overall—to 1 or complete segregation.

39. Based on the 2020 Census block groups, the index of dissimilarity in Georgetown County is 0.5941. This means that 59% of Black (or White) residents would need to move to achieve a uniform population by race. Similar results are achieved when the value of D is calculated using census tracts: 0.546.

40. Table 7 shows the racial/ethnic composition of the census tract and census block group where the proposed site is located compared to Georgetown County overall in 2020. The tract and block group containing the proposed site have a higher concentration of White residents—72.5% and 74.4%, respectively—than the county overall (65.0%).

**Table 7. Racial/Ethnic Composition of Georgetown County & Proposed Site, 2020**

|  | Total Population | White | Black | Hispanic | All Other Races |
|---|---|---|---|---|---|
| Georgetown County | 63,404 | 65.0% | 28.5% | 3.5% | 3.1% |
| *Proposed Site Location* | | | | | |
| Tract 9203.02 | 2,921 | 72.5% | 18.9% | 4.8% | 3.8% |
| Block Group 2 | 1,889 | 74.4% | 17.0% | 4.7% | 3.9% |

Source: 2020 Decennial Census, Table P2
Note: Hispanic includes individuals of any race; all other race groups are non-Hispanic. All Other Races includes American Indian, Asian, Native Hawaiian/Pacific Islander, other race, and Multiracial

41. If the proposed development were built and lease up occurred, it would have a significant impact on the racial/ethnic composition of the surrounding area. Table 8 shows the potential racial composition of LIHTC rental units under three different scenarios:

- Scenario 1: housing units are occupied according to the racial composition of renters currently receiving subsidized housing in Georgetown County (86% Black, 14% White based on HUD reports)
- Scenario 2: housing units are occupied according to the overall racial composition of the income eligible-population (by <40% and <50% AMI) after adjusting for family size. Black households comprised 70% of LIHTC-eligible households.

13

- Scenario 3: housing units are occupied according to the income-eligibility *by family size*. Black households range from 66% of income-eligible 1- and 2-person families to 81% of 3- and 4-person families.

**Table 8. Racial composition of LIHTC-eligible under 3 scenarios**

|  | Black | White | All Other Groups |
|---|---|---|---|
| Subsidized Renter Households (HUD) | 85% | 14% | 1% |
| By income threshold (adjusted for family size) | | | |
| Less than 40% AMI | 70% | 23% | 8% |
| Less than 50% AMI | 70% | 24% | 7% |
| By income threshold *and* family size | | | |
| Less than 40% AMI | | | |
| 1- and 2-person family | 66% | 28% | 6% |
| 3- and 4-person family | 81% | 13% | 7% |
| 5+ person family | 65% | 11% | 23% |
| Less than 50% AMI | | | |
| 1- and 2-person family | 67% | 28% | 5% |
| 3- and 4-person family | 79% | 15% | 6% |
| 5+ person family | 66% | 12% | 22% |

Sources: HUD Picture of Subsidized Housing, 2015–2019 5-Year ACS IPUMS-USA
Values may not sum to 100% due to rounding.

42. I applied this racial/ethnic distribution of eligible renters to get an estimate of how these units would be occupied if they aligned with the broader county demographics for race/ethnicity, income, and family size.

43. Table 9 shows the results of this analysis. Depending on the assumptions, the number of Black renter households ranges from 60/90 = 67% (Scenario 2) to 77/90 = 86% (Scenario 1). The total number of residents that are Black range from 252/364 = 69% (Scenario 2) to 312/364 = 86% (Scenario 1).[26] Under all scenarios, the occupants of the proposed development would be disproportionately Black.

**Table 9. Estimated Racial Composition of Proposed Development Under 3 Scenarios**

|  | Total Units | | | | Total Population | | | |
|---|---|---|---|---|---|---|---|---|
|  | Total | # Black | # White | All Other | Total | # Black | # White | All Other |
| Scenario 1: Subsidized Renter Households | | | | | | | | |
| 1 Bedroom | 12 | 10 | 2 | 0 | 18 | 15 | 3 | 0 |
| 2 Bedroom | 42 | 36 | 6 | 0 | 147 | 126 | 21 | 0 |

---

[26] The "all other races" group is primarily Hispanic. Hispanic households have, on average, larger household sizes and comprise a greater share of LIHTC-eligible households with 5+ persons. These estimates do not account for other factors, such as immigration status, that may influence LIHTC-eligibility.

14

|  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|
| 3 Bedroom | 36 | 31 | 5 | 0 | 199 | 171 | 28 | 0 |
| Total | 90 | 77 | 13 | 0 | 364 | 312 | 52 | 0 |
| Scenario 2: LIHTC-Eligibility (by threshold) | | | | | | | | |
| 1 Bedroom | 12 | 8 | 3 | 1 | 19 | 12 | 5 | 2 |
| 2 Bedroom | 42 | 29 | 10 | 3 | 148 | 102 | 35 | 11 |
| 3 Bedroom | 36 | 25 | 9 | 2 | 199 | 138 | 50 | 11 |
| Total | 90 | 60 | 25 | 5 | 366 | 252 | 90 | 24 |
| Scenario 3: LIHTC-Eligibility (by threshold and bedroom size) | | | | | | | | |
| 1 Bedroom | 12 | 8 | 4 | 0 | 18 | 12 | 6 | 0 |
| 2 Bedroom | 42 | 33 | 6 | 3 | 148 | 116 | 21 | 11 |
| 3 Bedroom | 36 | 24 | 5 | 7 | 199 | 132 | 28 | 39 |
| Total | 90 | 62 | 15 | 13 | 365 | 260 | 55 | 50 |

Note: Values are rounded. Population in each rental unit is assumed to be 1.5 persons for 1 bedroom, 3.5 persons for 2 bedroom, and 5.5 persons for 3 bedroom.

44. Because the area where the development would have occurred is disproportionately White relative to the county (Table 7) and the occupants of the proposed development would have been disproportionately Black (Table 9), building this unit would have had an impact on the racial composition of the area. Table 10 shows the potential impact of the proposed development on the population of the block group where it would be located. Under the scenarios considered above, the population proportion that is Black would range from 25% (Scenario 2) to 28% (Scenario 1), an increase from the current share of 17%. Under Scenario 1, the racial/ethnic composition of the block group would mirror the racial/ethnic composition of Georgetown County overall.

Table 11. Potential impact of proposed development on block group population

|  | Population Count | | | | % of Population | | |
|---|---|---|---|---|---|---|---|
|  | Total Population | Black | White | All Other Races | Black | White | All Other Races |
| **Current Block Group** | **1,889** | **322** | **1,405** | **162** | **17%** | **74%** | **9%** |
| Scenario 1 | 2,253 | 634 | 1,457 | 162 | 28% | 65% | 7% |
| Scenario 2 | 2,255 | 574 | 1,495 | 186 | 25% | 66% | 8% |
| Scenario 3 | 2,254 | 582 | 1,460 | 212 | 26% | 65% | 9% |
| Georgetown County | 63,404 | 18,051 | 41,186 | 4,167 | 28% | 65% | 7% |

Source: Current block group population characteristics derived from 2020 Census. Population under scenarios derived from impacts displayed in Table 10.

15

*Summary*

45. Within Georgetown County, there are significant levels of segregation: 59% of White (or Black) residents would need to move to different block groups for each block group to have the same racial/ethnic composition as the county overall. The block group where the proposed development would have been built was disproportionately White relative to the county overall, and the occupants of the proposed development would have been disproportionately Black.

46. If this proposed development were built and occupied, the racial composition of the block group residents would be more like the county overall than it currently is. Based on this evaluation, I find that the decision to not approve the proposed LIHTC development perpetuates segregation in Georgetown County.

## XI. Verification

47. I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently thereto.

## XII. Disclosures

48. I was retained by Venable LLP on January 19, 2022, and have not testified as an expert at trial or by deposition in any cases during the previous four years. I was paid at a rate of $250 per hour for the research and writing of this report.

*Bennett*
2024-08-08